225 F.2d 709
 UNITED STATES of America, Appellant,
v.
Ira R. URE and Edna B. Ure, husband and wife, Edward O. Muir and Mary W. Muir, husband and wife, and Clarence Roberts and Afton W. Roberts, husband and wife, doing business under the name and style of Owyhee Farms, Appellees.
UNITED STATES of America, Appellant,
v.
FINE SHEEP COMPANY, a corporation, Appellee.
 No. 14127.
 No. 14128.
 United States Court of Appeals Ninth Circuit.
 September 12, 1955.
 
 J. Lee Rankin, Asst. Atty. Gen., William H. Veeder, Sp. Asst. to Atty. Gen., C. E. Luckey, U. S. Atty., Portland, Or., for appellant.
 Gallagher & Gallagher, Ontario, Or., Robert D. Lytle, Roy Kilpatrick, Lytle, Kilpatrick & Schroeder, Vale, Or., for appellee.
 Before HEALY, BONE, and ORR, Circuit Judges.
 HEALY, Circuit Judge.
 
 
 1
 The two suits presently before us were brought against the United States under the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346, 2671 et seq. Judgments in damages were awarded below in favor of appellees for the flooding of their lands following breaks in what is known as the North canal of the Owyhee Reclamation project, centered in Malheur County, Oregon. This is a project constructed and being operated by the United States Reclamation Service.
 
 
 2
 One hundred ninety-one other suits growing out of the same breaks were brought by water users served by the canal seeking damages for loss of crops consequent on the government's failure to deliver water for a period following the occurrence. Their lands were not subjected to flooding. The two groups of cases were by the court consolidated for the purpose of pre-trial conference and the taking of evidence as to liability. In the group not involving flooding the court found that the United States was not chargeable with negligence, but had exercised due care in the performance of its obligation to deliver water. Upon appeal that decision was affirmed. White v. United States, 9 Cir., 193 F.2d 505. On the same record the trial court granted its judgments against the government in the flooding suits now under consideration. The opinion of the court (Judge Fee) in the consolidated cases is reported in D.C., 93 F.Supp. 779.
 
 
 3
 The North canal is one of the major structures of a project which has converted a largely arid region into a rich agricultural area. Its source of supply is the Owyhee River, where the Service erected a dam impounding waters of that stream at a point some 35 miles distant from the scene of the flooding. The canal was built in 1935 pursuant to plans of competent engineers of the Service, who followed the general practices of canal construction in the area. The canal's location was necessarily determined by the source of the water and by the terrain. Eleven years of successful operation preceded the breaks.
 
 
 4
 The first break occurred on July 14, 1946, a half-hour after the second of two daily inspections by ditch riders had failed to disclose existence of any danger. The second break occurred five days later at a point some 30 feet below the first, a few hours after repairs of the first break had been completed. At the points where the breaks occurred the canal is located on the lower slope of a hill. Normally, the water flowed in the portion of the canal which had been excavated in the natural soil, that is to say, the flow was not against the built-up portion of the bank. The canal at this place was not lined with any special material. The slope from the lower bank toward the cultivated lands below is gentle, but its steepness increases sharply some distance below the canal. An engineer who observed the second break testified that the bottom of the canal went out — not the built-up bank. The lands on which the damages from the flooding occurred lie at least a half mile distant from the breaks and approximately 260 feet below the canal in elevation. The escaping waters from both breaks followed an identical course.
 
 
 5
 It appears customary in respect of canals of this type to make engineering inspections during the non-irrigation season (when water is not flowing in the canal) and to make two inspections each day by non-engineers (ditch riders) while the canal is in operation. This was the practice followed by the Service in the present instance, and the inspections made disclosed no danger. An investigation of the first break did not reveal its cause or disclose any indication of further peril. Repairs were made hurriedly to permit the resumption of irrigation at the earliest possible moment. Extensive investigations after the second break disclosed that the earth four feet below the bottom of the canal was saturated with water and had completely broken down. The inability of this saturated subsoil to support the weight of the water flowing through the canal was advanced by the government in its showing as the cause of the breaks. However, the trial court found that the cause after the lengthy period of operation was conjectural.
 
 
 6
 The court predicated its judgment against the government in the present cases primarily upon the principle of absolute liability enunciated in Rylands v. Fletcher, 1 E.R.C. 236, L.R., 3 H.L. 330. That principle, of course, is that one who permits a highly dangerous instrumentality or agency which is located on his property and is under his control to escape and damage another is liable for the damage irrespective of negligence or fault. The court was of the view that the Rylands v. Fletcher doctrine is accepted in Oregon, and language found in a subsequent Oregon decision, Brown v. Gessler, 191 Or. 503, 230 P.2d 541, 23 A.L.R.2d 815, probably confirms the view. At the time of the decision below, Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427, had not been decided. In Dalehite the Court held that the Federal Tort Claims Act may be invoked only on a "`negligent or wrongful act or omission'" of a government employee. "Absolute liability, of course," said the Court, "arises irrespective of how the tortfeasor conducts himself; it is imposed automatically when any damages are sustained as a result of the decision to engage in the dangerous activity. The degree of care used in performing the activity is irrelevant to the application of that doctrine. But the statute requires a negligent act. So it is our judgment that liability does not arise by virtue either of United States ownership of an `inherently dangerous commodity' or property, or of engaging in an `extrahazardous' activity." [Emphasis supplied.] Dalehite v. United States, 346 U.S. at pages 44-45, 73 S.Ct. at page 972. Clearly, then, the basic principle relied on below may not now be applied. Cf. Rayonier, Inc., v. United States, 9 Cir., 225 F.2d 642.
 
 
 7
 Another legal ground to which the trial judge resorted and ably developed was the common law doctrine of liability without fault applicable in cases of trespass upon the property of another. For present purposes, as the judge recognized, this doctrine is indistinguishable from the principle of absolute liability enforced in cases involving the employment of an inherently dangerous agency. In light of the holding in Dalehite this ground, too, must be rejected in cases brought under the Tort Claims Act. Cf. Harris v. United States, 10 Cir., 205 F.2d 765.
 
 
 8
 Res ipsa loquitur, also, was relied on by the trial court as supporting its holding. As that doctrine is generally understood it has its basis in inferences of negligence drawn by the trier of fact. In White v. United States, supra, involving the identical facts now being considered, the trial court found the doctrine inapplicable, and we affirmed the decision. The conflicting determination in the present cases is traceable to the trial court's conviction that a much higher duty of care rested upon the United States in respect of persons exposed to flooding. The danger to such parties was thought greater than to those who suffered damage merely from being deprived of water. See the opinion below, at page 786 of 93 F.Supp. of the report. At another place in its opinion, 93 F. Supp. at page 788, the court observed that the res ipsa loquitur doctrine is merely a modern version of the application of the principle of absolute liability. As already indicated we think the rule, when properly resorted to, is predicated on negligence inferred from all the circumstances producing the loss, plus a failure of the party who controlled the destructive force to come forward with evidence peculiarly within his knowledge indicating that his negligence did not cause the loss. United States v. Johnson, 9 Cir., 181 F.2d 577, 582.
 
 
 9
 Although a study of the trial court's opinion persuades us that principles of absolute liability pervaded the trial court's thinking and determined the outcome of these cases under all three theories of liability adopted, we have considered the applicability of res ipsa loquitur and are of opinion that the evidence introduced by the government rebutted all inferences which could properly have been drawn under that doctrine. McPherson v. Oregon Trunk Railway, 165 Or. 1, 9, 10, 102 P.2d 726; cf. Commercial Molasses Corp. v. New York Barge Corp., 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89. From our examination of the entire record we hold that a finding of negligence based on the doctrine would be clearly erroneous.
 
 
 10
 Customary methods of construction and inspection followed by canal owners in the arid states were utilized by the Reclamation Service in this instance. Inspections of the soil during construction and of the canal after operations commenced met adequate standards of due care, but did not and could not have revealed the danger. Eleven years of successful operation rebuts any inference that the inspections during construction were conducted negligently. Competent testimony which the trial court accepted in the companion cases not involving flooding, see opinion below, 93 F.Supp. at page 784, established that certain leaks which developed some distance from the canal prior to the breaks would not indicate to competent engineers that a break was impending. The record shows that after the first break careful inspections were made to determine if there was further danger. None was revealed. An unusual break had occurred, the cause of which was unknown. As the trial judge recognized, an essential duty of the Service was to restore the flow quickly in the interest of users whose crops were suffering. Inferences of negligence arising from the second break were rebutted by the evidence of inspection, by the fact that the repaired portion did not break again, and by the need for speed which made prolonged engineering inspection impracticable. The only discovery which would have given notice of the continued danger was the saturated soil buried four feet below the bed of the canal.
 
 
 11
 In his opinion the trial judge repeatedly alluded to the fact that the canal in the area of the breaks had not been lined with concrete or other impervious material. It appears to have been considered that a duty devolved upon the government, in the exercise of the very high degree of care thought to rest upon it, so to construct the canal as virtually to insure against breaks and consequent damage of the nature suffered here. The record discloses, however, that the decision not to line the canal throughout rested upon practical considerations, including the vital item of cost.[1] The decision in this respect was made by engineers of the Service and affirmed by the Bureau of Reclamation.
 
 
 12
 The witness R. J. Newell, long an official of the Service and in more recent years Regional Director of the Bureau, was in charge of the planning, construction, and operation of the Owyhee Irrigation Project. He testified that a determination of feasibility was a condition precedent to the project's construction. He stated that the major factors considered were the amount and quality of the land, the sufficiency of the water supply, and the costs of construction. The project was found feasible when the cost was estimated at $18 million. Feasibility, Newell said, would have been affected if costs had greatly exceeded the original estimate. The cost as built was about $180 per acre of lands to be irrigated. Newell estimated an additional cost of $40 to $45 per acre if the entire canal had been lined. He participated in the decision not to line the canal in its entirety and stated that "the cost was the principal factor, and the doubt of the necessity was a further reason." Concrete lining was used only when the canal was located high on a steep hillside and when the appearance of the formation was unfavorable. The canal was not lined at the point of the break "because the line was located near the foot of a sidehill, the supporting ground below the line being a gentle slope and nothing on the surface indicated a particular hazard at that point." The location of the canal was fixed by the location of the storage and diversion works and the requirements of the land. The general practices and standards of the Reclamation Bureau, Newell said, were followed in constructing the canal.[2]
 
 
 13
 Problems of the nature which confronted the Reclamation Service in this instance are matters necessarily calling for the exercise of discretion on the part of the governmental agency in charge. Inferences of negligence which might be drawn from the decision of the Service not to line the canal throughout, but only in locations where particular conditions obtained, fall clearly within the exception embodied in the Tort Claims Act, 28 U.S.C.A. § 2680(a). The section so far as material reads: "The provisions of * * * section 1346(b) of this title shall not apply to — (a) Any claim * * * based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." The decision in Dalehite v. United States, supra, 346 U.S. at pages 17-45, 73 S.Ct. 956, establishes the applicability of the exception to the present cases.
 
 
 14
 The judgments are reversed.
 
 
 
 Notes:
 
 
 [1]
 The cost of the project to the government was ultimately to be repaid ratably by the seven irrigation districts to be supplied with water in whole or in part. In turn, of course, the costs would devolve upon the water users in the several districts
 
 
 [2]
 Grant Gordon, Bureau of Reclamation engineer who was in charge of repairing the breaks, testified that "we have to consider cost to have an economically feasible project. We recognize that we are not able from an economic standpoint to test every inch of a canal as carefully as we must test the abutments and the foundation for a dam." Lining with concrete is not a complete solution. Economic factors are important. The Bureau can't afford to line an entire canal. An earth canal is often safer. Gordon testified further that in an enterprise of this sort calculated risks must be taken. The engineers' problem is to see if a project can be developed which is reasonably assured of success. "We are limited by economic considerations as to how far we can insure [safety]."
 Allen C. Merritt, engineer and an expert witness for appellees testified that the general practice for the construction of canals in the area was followed by the Bureau. He stated that cost of construction is one factor in determining the economic soundness of an irrigation canal and that the determination of whether or not to line a canal is a discretionary function of engineers. Cost is a factor in exercising this discretion.
 James A. Bouton, engineer and an expert witness for appellees, testified that the decision to line or not to line a canal is a matter of engineering discretion. Safety and economics are factors to be weighed in exercising this discretion.