880 F.2d 1018
 KENNEWICK IRRIGATION DISTRICT, Plaintiff-Appellee,
v.
UNITED STATES of America, Defendant-Appellant.
KENNEWICK IRRIGATION DISTRICT; Burlington Northern Railroad
Company; National Railroad Passenger Corporation,
Plaintiffs-Appellees,
v.
UNITED STATES of America, Defendant-Appellant.
KENNEWICK IRRIGATION DISTRICT, Plaintiff-Appellee,
v.
UNITED STATES of America, Defendant-Appellant.
 Nos. 87-4203, 87-4204 and 88-3800.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 14, 1988.
Submission Withdrawn Feb. 24, 1989.
Resubmitted March 21, 1989.
Decided July 12, 1989.
As Amended Aug. 28 and Oct. 23, 1989.
 
 Irene M. Solet, Appellate Staff, Civ. Div., Dept. of Justice, Washington, D.C., for defendant-appellant.
 Robert J. Crotty and Andrew C. Bohrnsen, Lukins & Annis, P.S., and John C. Riseborough, Paine, Hamblen, Coffin, Brooke & Miller, Spokane, Washington, for plaintiffs-appellees.
 Westland, Liebler, Ivey, Larsen, Quigley & Hugill, Kennewick, Wash., for the Kennewick Irrigation Dist.
 Appeal from the United States District Court for the Eastern District of Washington.
 Before WRIGHT, J. WALLACE and PREGERSON, Circuit Judges.
 WALLACE, Circuit Judge:
 
 
 1
 The United States appeals from a judgment in favor of plaintiffs Kennewick Irrigation District (Kennewick), the National Railway Passenger Corporation (National Railway) and Burlington Northern, Inc. (Burlington Northern). Plaintiffs brought separate suits under the Federal Tort Claims Act (FTCA), 28 U.S.C. Sec. 1346(b), to recover for property damage and personal injuries arising out of two breaks in Kennewick's main irrigation canal. The canal was designed and constructed in the mid-1950s by the United States Bureau of Reclamation (Bureau). On appeal, the government contends that its actions in designing and constructing the main canal cannot give rise to liability under the FTCA because they fall within the "discretionary function" exception to that act's waiver of sovereign immunity. Alternatively, the government argues that the Amendatory Repayment Contract (Repayment Contract) between Kennewick and the United States precludes recovery against the government by plaintiffs. The district court exercised jurisdiction under 28 U.S.C. Sec. 1346(b). We have jurisdiction over this timely appeal pursuant to 28 U.S.C. Sec. 1291. We affirm in part and vacate and remand in part.I
 
 
 2
 Begun in the early 1900s and located in south-central Washington state, the Yakima Project was one of the first federal reclamation projects in the Pacific Northwest. In 1948, Congress authorized construction of the Kennewick Division to complete the Yakima Project. Yakima Project, Washington-Kennewick Division Act, Pub.L. No. 80-629, 62 Stat. 382 (1948), reprinted in 1948 U.S.Code Cong. Serv. 397. At the time of the authorization, Kennewick was operating as a local irrigation district; its facilities were incorporated into the Kennewick Division. The Yakima Project now consists of the federally operated Storage Division, which supervises the entire Yakima River water supply, and six irrigation divisions, including Kennewick, each operated under contract by a local irrigation district. In addition to its main canal, which is the subject of these lawsuits, the Kennewick Division consists of a power canal, hydroelectric power and hydraulic pumping plants, a lateral system, and various other structures.
 
 
 3
 Prior to construction, the government and Kennewick entered into the Repayment Contract. The Repayment Contract established the amount of Kennewick's estimated construction costs attributable to irrigation and the terms under which users of irrigation water would reimburse the government for a portion of those costs. Formation of such a contract was required by statute as a condition of delivery of irrigation water. See 43 U.S.C. Sec. 485h(d).
 
 
 4
 After substantial completion of construction, the government operated the main canal for an initial period and then turned it over, along with certain other portions of the division, to Kennewick for operation and maintenance. There were numerous breaks in the main canal during its first year of operation by the government. In later years, there were periodic breaks but none between 1964 and 1972.
 
 
 5
 The two breaks at issue in these appeals occurred on May 6, 1979, and September 12, 1982. The 1979 break washed out a Benton County road as well as a railroad right-of-way and track bed, causing derailment of a passenger train with resulting personal injuries. Burlington Northern, National Railway, Benton County, and adjacent landowners incurred property damage. The 1982 break, which occurred at a different location on the canal, caused property damage to the canal, Benton County, and adjacent landowners.
 
 
 6
 Much of the area traversed by the main canal is composed of highly erodible material such as silt, gravel, and cobble. Although at the time of initial construction certain portions of the canal were lined with concrete, most of the canal--including the locations of the 1979 and 1982 breaks--was unlined.
 
 
 7
 Burlington Northern and National Railway brought consolidated actions against Kennewick, the United States, and others for damages arising from the 1979 break. After various settlements had been reached, the district court entered an order realigning the parties and styling the action as one by Kennewick, National Railway, and Burlington Northern against the United States. In a second lawsuit, Kennewick sought recovery from the United States for third-party damage claims arising out of the 1982 break which had been paid by Kennewick. In a third lawsuit, Kennewick sued the United States for the costs of repair and renovation of the facilities and structures of the main canal. The three actions were consolidated for trial.
 
 
 8
 By agreement among the parties, the consolidated cases were bifurcated into liability and damages phases and heard before a magistrate. In the liability phase, the magistrate found that both the 1979 and 1982 breaks resulted from "piping," a phenomenon whereby fine silts are eroded by water into an open area such as a rodent hole, causing a gradually increasing channel and eventually a break in the canal. The magistrate further found that negligence by the United States in both the design and the construction of the Kennewick main canal was the proximate cause of the piping and therefore of the canal breaks. The magistrate determined that in designing the canal, the Bureau negligently failed to take the danger of piping into account. The magistrate found the Bureau's design negligent in failing to (1) line the entire canal with concrete, (2) install filters around culverts, and (3) install filter material between the compacted silt which formed the bed of the canal and the open gravel or cobbles beneath it. The magistrate also found that the Bureau's contracting officer, who oversaw the general contractor's work, failed to excavate unsuitable material as provided in the contract's specifications, and that this constituted negligence in the construction of the canal.
 
 
 9
 The magistrate rejected several defenses advanced by the government. He determined that the decisions concerning lining of the canal and other aspects of canal design and construction were simply engineering decisions, not discretionary decisions grounded in social, economic, or political policy. As a result, the magistrate held that these decisions fell outside the discretionary function exception. The magistrate also rejected the government's defense based on the provision of the Repayment Contract which made "expenditures made by the United States on account of damage claims of all kinds" a reimbursable cost of construction of the Kennewick Division. The magistrate concluded that this provision was not intended to hold the government harmless for claims by third parties for damages resulting from negligent design and construction of the canal. The district court entered judgment against the government on the issue of liability for the 1979 and 1982 breaks.
 
 
 10
 In the subsequent damages phase of the trial, the magistrate awarded damages of $1,225,805.08 to Kennewick, $147,019.99 to National Railway, and $31,905.00 to Burlington Northern for damages stemming from the 1979 break. In addition, the magistrate awarded damages of $200,288.00 to Kennewick for the 1982 break. For the costs of canal repair work, Kennewick was awarded an additional $123,265.23.
 
 II
 
 11
 The United States first argues that its actions in designing and constructing the Kennewick main canal cannot give rise to liability under the FTCA because they fall within the "discretionary function" exception. We review independently the district court's determination of subject matter jurisdiction under the discretionary function exception. Arizona Maintenance Co. v. United States, 864 F.2d 1497, 1499 (9th Cir.1989) (Arizona Maintenance ); Mitchell v. United States, 787 F.2d 466, 468 (9th Cir.1986) (Mitchell ), cert. denied, 484 U.S. 856, 108 S.Ct. 163, 98 L.Ed.2d 118 (1987).
 
 
 12
 The FTCA authorizes civil suits against the United States
 
 
 13
 for money damages ... for injury or loss of property, or personal injury ... caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.
 
 
 14
 28 U.S.C. Sec. 1346(b). The FTCA contains several exceptions, however, to this broad waiver of sovereign immunity. Berkovitz v. United States, 486 U.S. 531, 108 S.Ct. 1954, 1958, 100 L.Ed.2d 531 (1988) (Berkovitz ).
 
 
 15
 The discretionary function exception excludes from the purview of the FTCA "[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. Sec. 2680(a). This exception " 'marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals.' " Berkovitz, 108 S.Ct. at 1958, quoting United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 808, 104 S.Ct. 2755, 2762, 81 L.Ed.2d 660 (1984) (Varig ). Grounded in separation of powers concerns, the discretionary function exception reflects Congress's "wish[ ] to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." Varig, 467 U.S. at 814, 104 S.Ct. at 2765; see also Begay v. United States, 768 F.2d 1059, 1064 (9th Cir.1985) (Begay ).
 
 
 16
 Three important decisions by the Supreme Court have developed the contours of the discretionary function exception: Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953) (Dalehite ), Varig, and Berkovitz. Dalehite, the Court's first major decision in this area, involved numerous claims of negligence arising out of a catastrophic explosion of fertilizer containing ammonium nitrate in Texas City, Texas. The fertilizer was manufactured by the United States as part of its post-war effort to increase the food supply in areas under military occupation. Plaintiffs argued that the government was negligent in drafting and approving the detailed fertilizer export plan as a whole, performing various phases of the manufacturing process as dictated by the plan, including coating, bagging, and labeling of the fertilizer, and failing adequately to police the shipboard loading of the fertilizer. Id. at 23-24, 73 S.Ct. at 961-62. Although declining "to define, apart from this case, precisely where discretion ends," id. at 35, 73 S.Ct. at 968, the Court held that all of plaintiffs' claims fell within the discretionary function exception. The Court wrote:
 
 
 17
 [T]he "discretionary function or duty" that cannot form a basis for suit under the [Federal] Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable. If it were not so, the protection of Sec. 2680(a) would fail at the time it would be needed, that is, when a subordinate performs or fails to perform a causal step, each action or nonaction being directed by the superior, exercising, perhaps abusing, discretion.
 
 
 18
 Id. at 35-36, 73 S.Ct. at 967-68 (footnotes omitted).
 
 
 19
 In Varig, the Court reaffirmed the continuing validity of Dalehite. See 467 U.S. at 811-13, 104 S.Ct. at 2763-64. Varig involved lawsuits arising out of two airplane crashes. Plaintiffs alleged that the Federal Aviation Administration (FAA) had been negligent in adopting and administering a system of spot checks to determine whether air safety regulations were being followed. The Court held that the discretionary function exception applied to both the initial agency decision to adopt a spotcheck system of compliance review and the application of that system to the particular planes involved in the two crashes. Id. at 819, 104 S.Ct. at 2767. In deciding how much it would "supervise the safety procedures of private individuals," the FAA was "exercising discretionary regulatory authority of the most basic kind." Id. at 819-20, 104 S.Ct. at 2767-68. The FAA's decisions involved "political, social, and economic judgments" that concerned how best to "accommodate[ ] the goal of air transportation safety and the reality of finite agency resources." Id. at 820, 104 S.Ct. at 2768. As for the FAA employees' acts in implementing the spot-check program, these too involved discretionary judgments since the employees "were specifically empowered to make policy judgments regarding the degree of confidence that might reasonably be placed in a given manufacturer, the need to maximize compliance with FAA regulations, and the efficient allocation of agency resources." Id.
 
 
 20
 In Varig, the Court identified two factors which were useful in determining whether acts of a governmental employee fell within the "discretionary function" exception. "First, it is the nature of the conduct, rather than the status of the actor," that is significant. Id. at 813, 104 S.Ct. at 2764. With this statement, the Court seemed to disapprove of the operational/planning distinction employed by some lower federal courts according to which "planning" activities were discretionary but "operational" activities were not. See Begay, 768 F.2d at 1062 n. 2. The Court clarified that "the basic inquiry ... is whether the challenged acts of a Government employee--whatever his or her rank--are of the nature and quality that Congress intended to shield from tort liability." Varig, 467 U.S. at 813, 104 S.Ct. at 2764 (emphasis added). Second, the Court explained that the discretionary function exception was aimed particularly at the government's actions "in its role as a regulator." Id. at 813-14, 104 S.Ct. at 2764-65. "This emphasis upon protection of regulatory activities," stated the Court, was an expression of Congress's desire "to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy." Id. at 814, 104 S.Ct. at 2765. Although regulatory activities lie at the heart of the exception, the exception also covers other activities "not of a regulatory nature, such as the expenditure of Federal funds, the execution of a Federal project, and the like." Id. at 809-10, 104 S.Ct. at 2762-63, quoting Hearings on H.R. 5373 and H.R. 6463 before House Comm. on the Judiciary, 77th Cong., 2d Sess. 28, 33 (1942) (statement of Assistant Attorney General Francis M. Shea).
 
 
 21
 Varig also distinguished Indian Towing Co., Inc. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955) (Indian Towing ), a case decided shortly after Dalehite. Indian Towing had produced confusion in the lower courts because its seemingly expansive vision of governmental liability under the FTCA appeared to conflict with Dalehite. Varig attempted to dispel this confusion by explicitly rejecting the argument that "Dalehite ha[d] been eroded, if not overruled, by subsequent cases ... particularly Indian Towing," 467 U.S. at 811, 104 S.Ct. at 2763, and by pointing out that Indian Towing did not involve the discretionary function exception. Id. at 812, 104 S.Ct. at 2763. The plaintiff in Indian Towing sued for damages to cargo aboard his vessel which had run aground allegedly because there was no light in a lighthouse operated by the Coast Guard. 350 U.S. at 62, 76 S.Ct. at 123. The plaintiff's theory was that the Coast Guard had been negligent in inspecting, repairing and maintaining the light. Id. But Varig made it clear that in Indian Towing, the "government conceded that the discretionary function exception was not implicated ... arguing instead that the Act contained an implied exception from liability for 'uniquely governmental functions.' " 467 U.S. at 812, 104 S.Ct. at 2763 (emphasis in original); see also Indian Towing, 350 U.S. at 64, 76 S.Ct. at 2763. Indian Towing was devoted to explaining why the government's argument failed; it did not explicate the scope of the discretionary function exception. See also Indian Towing, 350 U.S. at 69, 76 S.Ct. at 126; see also id. at 69 n. 4, 76 S.Ct. at 127 n. 4 (citing Dalehite but not for its discretionary function discussion).
 
 
 22
 In Berkovitz, the Court revisited and further clarified the scope of the discretionary function exception. Reviewing a denial of the government's motion to dismiss for lack of subject matter jurisdiction, the Court held that "[t]he discretionary function exception applies only to conduct that involves the permissible exercise of policy judgment." 108 S.Ct. at 1960 (emphasis added). In Berkovitz, the plaintiff, a child, had contracted severe polio and become paralyzed after ingesting a dose of Orimune, a polio vaccine which had been licensed and approved by the National Institute of Health's Division of Biologic Standards (DBS). The plaintiff challenged both the DBS's initial licensing of Orimune and its approval of a particular lot of Orimune vaccine for release to the public. Id. at 1957.
 
 
 23
 The Court held that neither claim fell within the discretionary function exception. Id. at 1965. Berkovitz's negligent licensing claim had several facets. First, Berkovitz alleged that in deciding to license Orimune, the DBS violated statutory and regulatory requirements by failing to receive and evaluate certain required test data. Id. at 1962. After analyzing the regulations and concluding that they embodied specific mandatory directives, the Court reasoned that since the DBS had no discretion to violate these directives, DBS's conduct was not a discretionary function. As for Berkovitz's claim that DBS negligently licensed Orimune without complying with other safety standards, the Court offered three interpretations of this ambiguous allegation. Id. If the claim alleged that DBS licensed Orimune either without first determining whether it complied with the mandatory safety regulations or after determining that it failed to comply, the discretionary function exception posed no bar to the lawsuit. Id. However, if the claim alleged that DBS incorrectly determined that Orimune complied with regulatory safety standards, the crucial issue would be whether that determination "involve[d] the application of objective scientific standards ... [or] 'policy judgment.' " Id. at 1963; see also id. at 1963 n. 11.
 
 
 24
 Turning to Berkovitz's claim of negligent release of the particular lot of Orimune, the Court held that it too did not fall under the discretionary function exception. The Court's holding hinged on plaintiff's allegation that the Bureau of Biologics had "adopted a policy of testing all vaccine lots for compliance with safety standards and preventing the distribution to the public of any lots that fail[ed] to comply." Id. at 1964. If plaintiff's allegations were true, the decisionmaker would have had no discretion to release the lot, and so the discretionary function exception would not apply. Id.
 
 
 25
 Unfortunately, despite its clarifying discussion Berkovitz also contained a confusing reference to Indian Towing. After explaining the proper scope of the discretionary function exception and recounting the holding in Varig, the Court added in a footnote:
 
 
 26
 The decision in Indian Towing ... also illuminates the appropriate scope of the discretionary function exception. The plaintiff in that case sued the Government for failing to maintain a lighthouse in good working order. The Court stated that the initial decision to undertake and maintain lighthouse service was a discretionary judgment. The Court held, however, that the failure to maintain the lighthouse in good condition subjected the Government to suit under the FTCA. The latter course of conduct did not involve any permissible exercise of policy judgment.
 
 
 27
 Id. at 1959 n. 3 (emphasis added) (citations omitted). The Court did not mention that Varig distinguished Indian Towing as not even involving the discretionary function exception. The plain language of Varig leaves this ambiguous footnote statement of little or no value in our analysis.
 
 
 28
 Even if we were to consider the Berkovitz footnote, however, we would need to decide what the last sentence meant--whether the failure to maintain the lighthouse is not protected under the discretionary function exception: (1) because it does not involve the exercise of policy judgment (i.e. judgment based on political, economic and social policy), or (2) because it does involve policy judgment but not permissible judgment (i.e. the government has no discretion to fail to replace the lighthouse bulb). Under the second interpretation, the lack of discretion must be attributable to some mandatory and specific directive removing the element of choice from the government decisionmaker. See infra part II.A.1. We conclude that only the first reading is plausible. While it is conceivable that the decisions involved in inspecting, repairing and maintaining a burned-out lighthouse lamp could be grounded on economic considerations, it is unlikely that they are grounded in economic policy where the government has already decided to maintain the lighthouse. See ARA Leisure Services, Inc. v. United States, 831 F.2d 193, 195 (9th Cir.1987) (ARA Leisure ) (fact that decisionmaker is required to work within a budget alone does not make decisions regarding maintenance of park roads a discretionary function). The more likely inference is that inspecting, repairing and maintaining the lighthouse involved decisions grounded not on political, economic or social, but rather on technological or scientific considerations.
 
 
 29
 The alternative reading of the Berkovitz footnote is implausible. "The Berkovitz reference to Indian Towing must be read in the context of Dalehite and Varig. A matter does not fall outside the discretionary function exception merely because the decision to embark on an activity has already been made. Were that the case, Dalehite and Varig would be eviscerated." Fishback & Killefer, The Discretionary Function Exception to the Federal Tort Claims Act: Dalehite to Varig to Berkovitz, 25 Idaho L.Rev. 291, 323 (1989).
 
 
 30
 With this analytical framework in mind, we turn to the dispute at hand. Berkovitz directs us to apply a two-step test for determining whether the discretionary function exception applies. We must "first consider whether the action is a matter of choice for the acting employee.... [T]he discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." Berkovitz, 108 S.Ct. at 1958. If the challenged conduct does involve an element of judgment, our second step is to "determine whether that judgment is of the kind that the discretionary function exception was designed to shield." Id. at 1959. To be shielded, the judgment must be " 'grounded in social, economic, and political policy.' " Id., quoting Varig, 467 U.S. at 814, 104 S.Ct. at 2765. At the outset we must distinguish between two types of allegedly negligent conduct on the part of the Bureau. Kennewick sued for and the magistrate found negligence in both design and construction of the main canal which was the proximate cause of the piping which resulted in the canal breaks. We must examine separately Kennewick's claims of negligence in design and construction because our analysis turns on "the nature of the conduct." Varig, 467 U.S. at 813, 104 S.Ct. at 2764. We examine the claim of negligence in design first.
 
 A.
 
 31
 The magistrate found that the canal's design was embodied in the 1955 Definite Plan Report (Report). In evaluating design decisions, the magistrate specifically found three instances of negligence: (1) the failure to line the canal, especially across gullies or torrential wash areas, (2) the failure to provide filters around culverts, and (3) the failure to install "filter material between the compacted silt which was to form the bed of the canal, and the open gravel and cobbles which lay beneath it in many stretches." These negligent design decisions overlooked the danger of piping, and therefore were a proximate cause of the 1979 and 1982 breaks. As for the decision not to line the canal, the magistrate also found that a preliminary report had recommended that one half of Division Two of the canal, where both breaks occurred, be lined; yet this was not done. In rejecting the argument that these design decisions were discretionary functions, the magistrate held that the Bureau's "failure to use recognized and accepted engineering standards in designing Division 2 of the main canal [was] simple negligence in the exercise of [a] scientific, engineering function."
 
 
 32
 The government contends that this case is controlled by our decision in United States v. Ure, 225 F.2d 709 (9th Cir.1955) (Ure ). Ure involved two suits arising out of canal breaks in Oregon, which flooded plaintiffs' lands. The canals were built by the Bureau under the same statutory scheme at issue in this case. We held in Ure that because "the decision not to line the canal throughout rested on practical considerations, including the vital item of cost," upon which the very feasibility of the project depended, the Bureau's decisions fell within the discretionary function exception. Id. at 712-13 & nn. 1-2.
 
 
 33
 Kennewick argues that Ure is distinguishable because here the government failed to follow objective engineering standards, including the Bureau's own standards. See id. at 710, 713. Essentially, Kennewick is arguing that in designing the canal, Bureau officials had no discretion to violate certain engineering standards. This is the first analytical step under Berkovitz. We must therefore "examine the nature of the challenged conduct and consider whether the government employee had any discretion to act, i.e., whether there was an element of choice." Arizona Maintenance, 864 F.2d at 1502.1.
 
 
 34
 Kennewick's contention requires us to consider when safety or engineering "standards" operate to remove discretion from a governmental actor. Berkovitz provides the appropriate starting point: "the discretionary function will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow" because then the "employee has no rightful option but to adhere to the directive." 108 S.Ct. at 1958-59 (emphasis added). The standards allegedly violated in Berkovitz were embodied in mandatory and specific federal regulations, statutes, or policies which imposed clear duties on governmental employees. See id. at 1961-64. Thus, the DBS had no discretion to issue a license for Orimune "without first receiving the required test data" since "to do so would violate a specific statutory and regulatory directive." Id. at 1962. Similarly, a failure by DBS to determine that Orimune had complied with regulatory safety standards before issuing a license would be actionable since "[u]nder the scheme governing the DBS's regulation of polio vaccines, the DBS may not issue a license except upon an examination of the product and a determination that the product complies with all regulatory standards." Id. The DBS had no discretion to "deviate from this mandated procedure" as such deviation would represent "a failure on the part of the agency to perform its clear duty under federal law." Id. at 1962-63.
 
 
 35
 On the other hand, after considering the regulatory scheme governing release of vaccine lots, the Court in Berkovitz held that these regulations did not remove discretion from the Bureau of Biologics. Id. at 1963. Rather, they require the Bureau of Biologics to prevent the distribution of noncomplying lots; the relevant regulations merely empowered the Bureau of Biologics to examine lots and to prevent distribution. Id. However, the inquiry did not end there. In his complaint Berkovitz had alleged that "under the authority granted by the regulations, the Bureau of Biologics has adopted a policy of testing all vaccine lots for compliance with safety standards and preventing the distribution to the public of any lots that fail to comply." Id. at 1964. The Court held that these allegations stated a claim under the FTCA because they challenged governmental action which involved no permissible exercise of policy discretion. Id. In other words, the Bureau of Biologics would have no discretion to violate a specific mandatory directive embodied in an adopted policy.
 
 
 36
 Berkovitz thus establishes that a safety or engineering standard operates to remove discretion under the FTCA when it is embodied in a specific and mandatory regulation or statute which creates clear duties incumbent upon the governmental actors. A general statutory duty to promote safety, as was incumbent upon the FAA in Varig, would not be sufficient. See Allen v. United States, 816 F.2d 1417, 1421 (10th Cir.1987) (Allen ) (broad and general duty imposed by statute on Atomic Energy Commission to promote safety in atomic testing left room for exercise of discretion), cert. denied, --- U.S. ----, 108 S.Ct. 694, 98 L.Ed.2d 647 (1988). Berkovitz also establishes that discretion may be removed by a specific mandatory governmental policy duly adopted under authority delegated by statute or regulation. Finally, in this circuit we have held that discretion may be removed if the government incorporates specific safety standards in a contract which imposes duties on the government's agent. See Camozzi v. Roland/Miller & Hope Consulting Group, 866 F.2d 287, 290 (9th Cir.1989) (Camozzi ) (U.S. Postal Service's subcontractor under contractual duty both to ensure general contractor's compliance with specific safety standards and to inspect work site held not insulated by discretionary function exception for violation of these duties; subcontractor's actions were "simply a failure to effectuate policy choices already made and incorporated in the contracts").
 
 
 37
 The rationale behind excluding from immunity under the discretionary function exception conduct which violates specific mandatory safety standards is simple. Once the government, having balanced economic, social and political policy considerations, adopts safety standards in the form of specific and mandatory regulations or policy, employees do not have any discretion to violate these standards. See ARA Leisure, 831 F.2d at 195-96. Indeed, to insulate such violations from liability would undermine the prior exercise of a discretionary function involved in formulating and adopting the binding standards.
 
 
 38
 In Starrett v. United States, 847 F.2d 539, 541-42 (9th Cir.1988), we recently stressed the requirement that such standards be both specific and mandatory. See also Baker v. United States, 817 F.2d 560, 564-66 (9th Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 2845, 101 L.Ed.2d 882 (1988). Other circuits have read Berkovitz similarly. See, e.g., Dube v. Pittsburgh Corning, 870 F.2d 790 (1st Cir.1989) (Dube ) (Navy regulation imposing duty to warn others of known hazards was not sufficiently specific or unambiguous to remove discretion under Berkovitz ); McMichael v. United States, 856 F.2d 1026, 1033 (8th Cir.1988) (private inspectors' failure to comply with Defense Department's specific mandatory procedures pursuant to contract not insulated by discretionary function); Doe v. Stephens, 851 F.2d 1457, 1462 (D.C.Cir.1988) (reading Berkovitz as holding that exception does not bar claims "based upon a governmental departure from clear regulatory standards"); see also Markes v. United States, 704 F.Supp. 337, 339 & n. 3 (N.D.N.Y.1988) (collecting cases); Thompson v. Dilger, 696 F.Supp. 1071, 1077-78 & n. 8 (E.D.Va.1988) (same).
 
 
 39
 Kennewick has pointed to no mandatory, specific statute, regulation, or policy which required the Bureau to include in its design of the Kennewick canal (1) concrete lining of the canal, (2) filters around culverts, or (3) filter material under the compacted silt forming the bed of the canal and the open gravel and cobbles which sometimes lay beneath it. See Colorado Flying Academy, Inc. v. United States, 724 F.2d 871, 875-77 (10th Cir.1984) (if mandatory, specific guidelines exist for formulation of design and these guidelines are violated, discretionary function exception does not apply), cert. denied, 476 U.S. 1182, 106 S.Ct. 2915, 91 L.Ed.2d 544 (1986). While Kennewick's citation to a popular 1948 textbook on soil mechanics may demonstrate that the dangers of piping were recognized at the time the canal was designed, it does not establish the existence of any mandatory directive binding upon Bureau engineers. Nor does Kennewick's citation to a 1952 edition of the Bureau's Earth Manual demonstrate any specific, mandatory directive which removed discretion from Bureau designers in this case. Kennewick stresses the Earth Manual 's statement that "[w]here an open canal passes through soils subject to erosion, or through material which would permit excessive losses by seepage, some type of canal lining must be provided." The Earth Manual immediately adds, however, that "[s]uch linings may be made of concrete, bituminous materials, or earth materials " and then lists as acceptable several types of earth lining, including "loose (uncompacted) earth" and "thin compacted earth." Since a thin compacted earth lining was provided at the sites of both canal breaks, there was no deviation from the Earth Manual 's provisions. Moreover, Kennewick's reliance on the Earth Manual assumes that the guide's provisions were more than merely advisory in nature. Yet the version of the Earth Manual quoted by Kennewick was a "tentative edition" subject to comments and revisions. We have no assurance either that a permanent edition was ever issued, or that such a permanent edition would contain binding regulations.
 
 
 40
 In sum, we conclude that the Bureau had discretion to make design decisions regarding the Kennewick canal. We must now examine the nature of the discretion exercised by the Bureau in designing the canal.
 
 2.
 
 41
 Here, as in Ure, the decision not to line the entire canal with "concrete or other impervious material" was a design decision. 225 F.2d at 712. Ure held that Bureau decisions regarding the design of an irrigation canal involved the protected exercise of a discretionary function. It was the type of decision which by nature "rested upon practical considerations, including the vital item of cost." Id. (footnote omitted); see also E. Ritter & Co. v. Department of the Army, 874 F.2d 1236 (8th Cir.1989) (design of flood control ditch under cost-sharing scheme a discretionary function). Concrete lining is a major factor affecting the cost of a canal. Moreover, under 43 U.S.C. Sec. 485h, which authorizes federal construction of irrigation projects like the Kennewick canal and the canal in Ure, design decisions such as those involved in this case are discretionary functions. For construction of these projects to occur, water users must agree to repay the Bureau for construction costs. This system inherently calls for the use of discretion by Bureau officials to consider construction costs and the water users' ability to repay those costs. It is this type of decision, as in Ure, that is within the purview of section 2680(a) because the engineers' decision not to line fully the canal was rooted in economic policy judgments.
 
 
 42
 Kennewick attempts to distinguish Ure on several grounds, none of which is persuasive. First, Kennewick argues that unlike in Ure, the Bureau failed in this case to prove that it had actually considered budgetary factors in deciding not to line the main canal. Kennewick suggests that even if these decisions are the type grounded in social, economic, or political policy judgments, the Bureau must prove that it considered these factors and made a conscious decision on the basis of them. We have already rejected this very argument. In In re Consolidated United States Atmospheric Testing Litigation, 820 F.2d 982, 998-99 (9th Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1076, 99 L.Ed.2d 235 (1988), plaintiffs argued, among other things, that the United States breached its duty to warn military and civilian participants in atomic weapons testing programs of the dangers to which they were exposed. We held that this failure to warn fell within the discretionary function exception. In so holding, we expressly rejected appellants' argument that "the discretionary function exception cannot apply in the absence of a 'conscious decision.' " Id. at 998. We stated:
 
 
 43
 The statute is not so limited; it exempts "[a]ny claim based upon ... the failure to exercise or perform a discretionary function ... [,]" 28 U.S.C. Sec. 2680(a)....
 
 
 44
 If the decision to issue or not to issue a "warning" is within the discretionary function exception, then logically the failure to consider whether to issue one necessarily falls within the exception as well. Any other interpretation of the statute would create insurmountable problems in its administration: What would constitute a "decision"? Would a decision to defer decision be a "decision"? ... As the Supreme Court said in Varig, one must look to "the nature of the conduct" to determine whether the exception applies. In this case, the relevant conduct is the issuance of "warnings," not the decision-making process or the failure to make a conscious, explicit decision.
 
 
 45
 Id. at 998-99. Other circuits have held similarly. See In re Ohio River Disaster Litigation, 862 F.2d 1237, 1247 (6th Cir.1988); United States Fidelity & Guaranty Company v. United States, 837 F.2d 116, 120-21 (3d Cir.) ("[I]t is irrelevant whether the government employee actually balanced economic, social, and political concerns in reaching his or her decision.... [T]he relevant question is not whether an explicit balancing is proved, but whether the decision is susceptible to policy analysis."), cert. denied, --- U.S. ----, 108 S.Ct. 2902, 101 L.Ed.2d 935 (1988); Allen, 816 F.2d at 1422 n. 5 (same); Myslakowski v. United States, 806 F.2d 94, 97-98 (6th Cir.1986) (same), cert. denied, 480 U.S. 948, 107 S.Ct. 1608, 94 L.Ed.2d 793 (1987). But cf. Dube, 870 F.2d at 798 (holding that "susceptible to discretion" approach, which insulates discretionary decisions even where decisionmaker failed to decide, applies only where challenged activity is a traditional governmental function); Alabama Electric Cooperative, Inc. v. United States, 769 F.2d 1523, 1531, 1536-37 (11th Cir.1985) (conducting exhaustive review of FTCA cases involving negligence in design and concluding that whether particular decision is insulated as discretionary function turns on whether designer actually weighed social, economic and political factors).
 
 
 46
 Kennewick also attempts to distinguish Ure because there the government was not negligent in designing and constructing the canal, whereas here it was. This is a distinction without a difference: negligence is simply irrelevant to the discretionary function inquiry. 28 U.S.C. Sec. 2680(a) (excluding as discretionary function "[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused ") (emphasis added); Mitchell, 787 F.2d at 468. Indeed, if the presence of negligence were allowed to defeat the discretionary function exception, the exception would provide a meager shield indeed against tort liability.
 
 
 47
 Our holding that the Bureau's design decisions fall within the discretionary function exception is consistent with the Supreme Court's recent observations in Boyle v. United Technologies Corp., --- U.S. ----, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). Boyle involved a wrongful death suit against a government contractor arising out of the crash of a military helicopter. The precise issue considered in Boyle was when a contractor providing military equipment to the federal government could be held liable under state tort law for injury caused by a design defect. In approving a "government contractor defense," the Court first stated that without such a defense state laws would "significantly conflict" with an area of "uniquely federal interest"--the procurement of military equipment under government contracts. Id. 108 S.Ct. at 2513-16. Without such a defense state tort law would conflict with the FTCA's discretionary function exception. The Court stated:
 
 
 48
 We think that the selection of the appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary function within the meaning of [28 U.S.C. Sec. 2680(a) ]. It often involves not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness.... [P]ermitting "second-guessing" of these judgments ... through state tort suits against contractors would produce the same effect sought to be avoided by the FTCA exemption. The financial burden of judgments against the contractors would ultimately be passed through, substantially if not totally, to the United States itself
 
 
 49
 ....
 
 
 50
 Id. at 2517-18 (citation omitted). Here, too, the Bureau's decisions in designing the Kennewick canal "involve[d] not merely engineering analysis but judgment as to the balancing of many technical," economic, "and even social considerations." Id. The Bureau's design decisions are therefore protected under the discretionary function exception.
 
 
 51
 Kennewick argues, however, that our decision in Arizona Maintenance requires a contrary result. In that case, a public utility serving water users in Arizona sued for damages to its wells caused by dynamite blasting undertaken by the United States. The blasting was used to make seismic refraction surveys in order to measure soil subsidence at potential canal construction sites for the Central Arizona Project. The utility, Arizona Maintenance Co., claimed negligence both in (1) the initial choice of blasting from several available methods for measuring subsidence, and in (2) the execution of the blasting program (i.e. the amount of dynamite used). The district court granted the government's motion for summary judgment, holding that both the decision to use dynamite and its implementation were discretionary functions. We reversed. We held that "[t]he choice of how much dynamite to use at the particular location was not one 'grounded in social, economic or political policy,' " Arizona Maintenance, 864 F.2d at 1504, quoting Varig, 467 U.S. at 814, 104 S.Ct. at 2765, but rather was "governed by objective standards." Id. This holding was consistent with Berkovitz 's teaching that decisions involving "the application of objective scientific standards"--such as how much dynamite to use to produce a refraction--are not insulated by the discretionary function exception because they do not involve the weighing of economic, political and social policy considerations. See Berkovitz, 108 S.Ct. at 1963. Unlike the decision of how much dynamite to use to achieve a certain seismic refraction, the design of the Kennewick canal involved a discretionary judgment.
 
 
 52
 As for Arizona Maintenance's challenge to the initial decision to use dynamite over other available methods, we remanded that question because of inadequacies in the record. 864 F.2d at 1504. Having held that we must remand the question, we "Clearly a decision to use the cheapest and easiest method in contravention of safety standards could not be a protected discretionary function, any more than the decision to leave a lighthouse in disrepair was protected in Indian Towing." Id. Arizona Maintenance did not establish a per se rule that government violation of "industry" standards precludes application of the discretionary function exception. Such a rule would collapse the discretionary function inquiry into the basic issue of negligence. Arizona Maintenance involved claims of negligence in the testing at a proposed canal construction site, not claims of negligence in the design of the canals. Read in the proper light, Arizona Maintenance does not require a contrary result in this case.
 
 B.
 
 53
 We turn now to Kennewick's claim of negligence in construction of the canal. The magistrate found that the section of the canal where both breaks occurred was constructed by Lewis Hopkins Co. as general contractor between January 1955 and July 1966. The magistrate further found that the Bureau's contracting officer oversaw this construction and exercised considerable control of the general contractor's day-to-day operations. The construction took place under a contract which contained specifications and provided that unsuitable material, as determined by the contracting officer, be stripped from underneath compacted embankments to the depth directed by him. The contract also provided that the surface under the embankments be scarified or plowed thoroughly to a depth of not less than 6 inches. The magistrate determined that "[n]o lining was installed at the sites of the 1979 and 1982 breaks, nor was there any excavation of unsuitable materials." The magistrate concluded that the contracting officer negligently failed to require excavation of unsuitable materials at the sites of the 1979 and 1982 breaks. The magistrate further held that the contracting officer was negligent in failing to "install any kind of filter material between the fine silt and the open gravel and cobble." The magistrate apparently found that this negligence was also a proximate cause of the canal breaks. We must now apply the two-step Berkovitz framework to determine whether the Bureau's construction decisions constituted discretionary functions.
 
 1.
 
 54
 We first consider whether the Bureau had discretion to act in constructing the Kennewick canal. Berkovitz, 108 S.Ct. at 1958. Kennewick argues that paragraph 42 of the construction contract removed from the Bureau's on-site contracting officer all discretion not to excavate unsuitable material. In Camozzi, 866 F.2d 287, we held that specific safety standards and required work-site inspections which had been embodied in a construction contract placed duties on an agent of the U.S. Postal Service. We held that the agent had no discretion or choice to disregard these contractual duties. Paragraph 42 of the construction contract here provided:Preparation of surfaces under embankments. Where compacted embankments are required, the entire surface of the foundations for the embankments shall be scarified or plowed thoroughly to a depth of not less than 6 inches. Except as provided below, preparation of surfaces under uncompacted embankments will not be required.
 
 
 55
 Where the ground surface under the embankment is not suitable, as determined by the contracting officer, for a foundation for the embankment, the contractor shall strip the area under the embankment of such unsuitable material to such depth as may be directed. The material so removed shall be disposed of as provided in Paragraph 48.
 
 
 56
 Kennewick argues that this language is mandatory, requiring the removal of any and all "unsuitable material," a term which is not defined in the contract. In response, the government argues that Paragraph 42 requires only that the ground surface be plowed to a depth of six inches, and that this was indeed done during the construction of Division 2. The government further argues that paragraph 42 authorizes removal of unsuitable material only when it is revealed by the scarification of the six inches of canal bed.
 
 
 57
 We reject both readings. Paragraph 42 required scarification of not less than 6 inches of soil but only "where compacted embankments are required." There is no contention that this provision was not carried out. Instead, Kennewick argues that the contracting officer failed at the sites of the breaks to "strip the area under the embankment of such unsuitable material to such depth as may be directed." This direction to strip unsuitable material only applied "[w]here the ground surface under the embankment is not suitable, as determined by the contracting officer." (Emphasis added.) Thus, the contracting officer was vested with discretion to determine when unsuitable material was present, and any duty to remove it was contingent upon a determination that such material was indeed present. See Varig, 467 U.S. at 820, 104 S.Ct. at 2767 (FAA inspectors who conducted compliance reviews of particular aircraft were exercising discretion). We must now consider whether that discretion involved the weighing of social, economic and political policy considerations. Berkovitz, 108 S.Ct. at 1958-59.
 
 2.
 
 58
 Kennewick argues that the contracting officer's discretion in deciding whether to remove unsuitable materials during construction was based not on policy judgments but on technical, scientific, engineering considerations. We agree. The government's own expert witness, Dr. Hall, testified that the contracting officer's on-site decisions would turn on sound engineering practices rather than on cost.
 
 
 59
 The government argues, however, that only excavations of three to five feet at the sites of the breaks would have uncovered the unsuitable material. It further argues that because removal of unsuitable materials to these depths would have significantly raised the cost of construction, the contracting officer's decisions were grounded on economic considerations and therefore immune from suit. In ARA Leisure, we held that the mere fact that Park Service maintenance personnel were required to work within a budget did not bring their failure to maintain a park road within the discretionary function exception. 831 F.2d at 196. Indeed, virtually all government actions affect costs since action itself requires resources. ARA Leisure governs this case. The contracting officer's on-site decisions were not "of the nature and quality that Congress intended to shield from tort liability." Varig, 467 U.S. at 813, 104 S.Ct. at 2764. They were not based on public policy and they are not entitled to immunity from lawsuit based on negligence under the discretionary function exception. The contracting officer had no "room for policy judgment and decision." Dalehite, 346 U.S. at 36, 73 S.Ct. at 968 (emphasis added).
 
 
 60
 In sum, we conclude that the Bureau's decisions in designing the Kennewick canal were discretionary functions, and therefore cannot form the basis of liability under the FTCA. We also hold that the Bureau's construction decisions were not discretionary functions. Since the district court found that negligent construction and design were both proximate causes of the canal breaks, we may affirm the district court's finding of liability on the part of the Bureau for the breaks.
 
 III
 
 61
 The United States next argues that provisions in its Repayment Contract with Kennewick foreclose recovery for damages caused by the canal breaks. The government may of course assert a contractual defense in a tort action under the FTCA without running afoul of the Tucker Act, 28 U.S.C. Sec. 1346(a)(2), which vests in the Court of Claims exclusive jurisdiction over contract claims against the United States in excess of $10,000. See 28 U.S.C. Sec. 1346(c); see also Woodbury v. United States, 313 F.2d 291, 296-97 (9th Cir.1963).
 
 
 62
 Federal law controls the interpretation of a contract entered pursuant to federal law when the United States is a party. United States v. Seckinger, 397 U.S. 203, 209-10, 90 S.Ct. 880, 884-85, 25 L.Ed.2d 224 (1970) (Seckinger ). For guidance, we may look to general principles for interpreting contracts. Saavedra v. Donovan, 700 F.2d 496, 498 (9th Cir.), cert. denied, 464 U.S. 892, 104 S.Ct. 236, 78 L.Ed.2d 227 (1983). The interpretation of a contract presents a mixed question of law and fact subject to independent review. James B. Lansing Sound, Inc. v. National Union Fire Insurance Co., 801 F.2d 1560, 1564 (9th Cir.1986).
 
 
 63
 "A written contract must be read as a whole and every part interpreted with reference to the whole." Shakey's Inc. v. Covalt, 704 F.2d 426, 434 (9th Cir.1983). "Preference must be given to reasonable interpretations as opposed to those that are unreasonable, or that would make the contract illusory." Id. "The fact that the parties dispute a contract's meaning does not establish that the contract is ambiguous." International Union of Bricklayers & Allied Craftsman Local No. 20 v. Martin Jaska, Inc., 752 F.2d 1401, 1406 (9th Cir.1985). A contract is ambiguous if reasonable people could find its terms susceptible to more than one interpretation. Castaneda v. Dura-Vent Corp., 648 F.2d 612, 619 (9th Cir.1981).
 
 
 64
 Article 32 in the Repayment Contract, entitled "Computation of Costs," provides:
 
 
 65
 The cost, which makes up the various obligations to be paid by the District to the United States under this contract, shall embrace all expenditures of whatsoever kind in relation to the function for which the charge is made, including, but without limitation by reason of this enumeration, cost of surveys and investigation, labor, property, material and equipment, engineering, legal, superintendence, administration, overhead, general expenses, inspection, special services and expenditures made by the United States on account of damage claims of all kinds, whether or not involving the negligence of the officers, agents or employees of the United States.
 
 
 66
 Kennewick contends that Article 32 is definitional only; it exists to determine the costs of various obligations incurred by the parties under other provisions of the contract but creates no obligations itself. To support this reading, Kennewick points to Article 32's title, "Computation of Costs," and its allegedly plain language. Kennewick also identifies contractual obligations contained in other provisions of the contract, including obligations for the costs of inspection, maintenance, and construction. With regard to the construction costs, Kennewick argues that these costs were fixed in 1953 by Article 8(a). Article 8(b) allows adjustments of those obligations but, according to Kennewick, Article 8 was meant to terminate when the fixed charges were paid. Without such termination, argues Kennewick, the construction charge "would remain open forever." Thus, Article 32 imposes no obligation on Kennewick to indemnify the United States for claims asserted after the fixing of construction costs arising out of negligent construction in which Kennewick played no role. The government argues, however, that Kennewick's interpretation frustrates the statutory objective of 43 U.S.C. Sec. 485h. It contends that section 485h provides for repayment of the cost of irrigation projects by water users. If the United States does not receive indemnity by virtue of Article 32, this statutory objective will be frustrated because the damage loss will shift from water users to federal taxpayers.
 
 
 67
 We conclude that Kennewick has the better of the argument. The statutory scheme also provides that obligations for construction costs cannot be unilaterally increased by the government. 43 U.S.C. Sec. 469 (prohibiting increases in construction charges once they have been established by public notice, unless agreed upon by majority of water-right applicants and Secretary of Interior). Kennewick's interpretation of the contract is consistent with legislative intent.
 
 
 68
 Not surprisingly, the government offers a different interpretation of Article 32. The government stresses that Article 32 places no limit on the costs Kennewick may incur and does not exclude damage claims due to the government's negligence. In addition, the government cites two other provisions in the Repayment Contract as examples where costs are not fixed and Kennewick has a continuing obligation to pay. The costs of inspection and the cost of maintenance are explicit continuing obligations for which Kennewick remains responsible even after the transfer of the canal is complete. According to the government, all three paragraphs create open-ended, unsettled obligations to be borne by Kennewick. Kennewick concedes that the cost of inspection and maintenance remain open, but argues that construction costs are treated differently in the Repayment Contract. Rejecting this argument, the United States urges us to read Article 32 as a continuing obligation to pay claims arising from any damage suits.
 
 
 69
 While Seckinger stands for the proposition that an indemnity agreement need not contain a key phrase or formulation for the provision to be operational, 397 U.S. at 213 n. 17, 90 S.Ct. at 886 n. 17, we conclude that Article 32, entitled "Computation of Costs," cannot reasonably be construed as an indemnity provision without any ceiling or termination date. At best, Article 32 is ambiguous. So viewed, the provision must be interpreted against the government, its drafter. Id. at 215-16, 90 S.Ct. at 887-88. If the government had intended to create an indemnity provision in the Repayment Contract, as an experienced entity in business, it easily could have done so. The district court correctly held that Kennewick has no obligation to indemnify the United States.
 
 IV
 
 70
 We hold Kennewick's claim was not barred by Article 32 of the Repayment Contract. We also hold that the discretionary function exception barred Kennewick's claim based on design negligence but not its claim based on negligence in construction. Since the magistrate found that the Bureau's negligence in both design and construction were proximate causes of the canal breaks, we affirm the determination of liability. Because we cannot tell from the record whether the magistrate relied on the Bureau's design negligence in assessing damages, we vacate the award of damages and remand for reconsideration of the amount of damages in light of our opinion.
 
 
 71
 AFFIRMED IN PART; VACATED IN PART AND REMANDED.