115 F.3d 1415
 1998 A.M.C. 912, 97 Cal. Daily Op. Serv. 4360,
97 Daily Journal D.A.R. 7275
 NATIONAL UNION FIRE INSURANCE; Restaurant Enterprises
Group, Plaintiffs-Appellees,
v.
UNITED STATES of America, Defendant-Appellant.
and
Army Corps of Engineers, Defendant.
NATIONAL UNION FIRE INSURANCE; Restaurant Enterprises
Group, Plaintiffs-Appellees-Cross-Appellants,
v.
UNITED STATES of America, Defendant-Appellant-Cross-Appellee.
 Nos. 94-55531, 94-55586.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 13, 1995.
Decided June 10, 1997.
 
 Sean A. Lev, United States Department of Justice, Washington, D.C., for the defendant-appellant-cross-appellee.
 Raymond H. Goettsch (Argued), and Edward A. Hoffman (On the Briefs), LaTorraca and Goettsch, Long Beach, California, for the plaintiffs-appellees-cross-appellants.
 Appeals from the United States District Court for the Central District of California; Mariana R. Pfaelzer, District Judge, Presiding. D.C. No. CV-88-06962-MRP.
 Before HUG, Chief Judge, BEEZER, and KLEINFELD, Circuit Judges.OPINION
 KLEINFELD, Circuit Judge:
 
 
 1
 This case turns on the discretionary function exception to the federal government's waiver of sovereign immunity for tort liability, under the Federal Tort Claims Act, 28 U.S.C. § 1346(b).
 
 Facts
 
 2
 For about a half century, the Army Corps of Engineers (Corps) has developed and improved King Harbor, in Redondo Beach, California. The original purpose of the project was "to establish a harbor for small-craft navigation." Section 101, River & Harbor Act of 1950, Pub.L. No. 81-516, 64 Stat. 163, 166 (1950). It did so by building a fourteen foot breakwater, which was completed in 1958.
 
 
 3
 The fourteen foot breakwater built in 1958 was not high enough to keep waves from damaging boats in the harbor during storms. In the mid sixties, the Corps raised the level of portions of the breakwater to 22 feet. By then the City of Redondo Beach had begun developing this entirely man-made harbor. The City had constructed "moles," apparently massive deposits in the harbor on which building could take place. By the 1980s, the City of Redondo Beach was collecting $3.7 million in rent from the harbor, eight million people a year were visiting, and there were numerous restaurants, hotels, apartment complexes, sport fishing and whale watching tours, and boat and bicycle rental and sale facilities, grossing over $59 million a year.
 
 
 4
 Despite the elevation of portions of the breakwater to 22 feet, winter storms continued to cause damage, more dollars of damage as people developed the moles. After millions of dollars in damages during the winters of 1980 and 1983, the Corps studied possible major improvements, in addition to its annual maintenance. The plan was to increase the remaining 14 foot high portion of the breakwater to 22 feet.
 
 
 5
 In 1985, the Corps discovered that it had made a mistake in its calculations. The breakwater was not as high as it was supposed to be. The 14 foot section, over which the waves were washing, was only 12 feet high and not 14 feet. The Corps concluded that this was because the seafloor had subsided as a result of oil extraction. Because its measuring devices were out of date, and it had not considered the potential for subsidence, the Corps had failed to discover the growing nonconformity of the breakwater to its design.
 
 
 6
 The Corps now had to decide whether to do nothing, raise the subsided portion of the breakwater back to fourteen feet, or await the results of an on-going study to decide whether to raise the breakwater in one larger project to 22 feet. Raising the breakwater a couple of feet was a major, not a trivial, engineering project. The Corps decided to leave the breakwater as it was, while it proceeded with studies directed toward more substantial improvement.
 
 
 7
 This decision was essentially a gamble on the weather. The Corps threw the dice, and the businesses on shore lost. A huge storm, the kind that hits Redondo Beach only once every sixty or seventy years, caused waves up to 21 feet high in January, 1988. They swept over the breakwater and caused almost $4 million dollars worth of damage to Reuben's Restaurant, whose owner and insurer brought this lawsuit. The theory of their lawsuit is that the government was negligent in failing to discover the subsidence and in failing to do something about it. The district judge held a bench trial, found liability and over $4 million dollars in damages, and awarded $2,485,110 in damages, as limited by the administrative claims plaintiffs' had filed. The government appeals the liability determination, while the insurer appeals the limitation on its damages.
 
 Analysis
 
 8
 The facts above are taken from the district court's findings of fact as amplified by the exhibits and testimony. They are not at issue on this appeal. The controlling issue is whether the discretionary function exception of the Federal Tort Claims Act barred jurisdiction. The United States has the burden of proving the applicability of the discretionary function exception. Prescott v. United States, 973 F.2d 696, 702 (9th Cir.1992). We review de novo a district court determination that the discretionary function exception does not apply. Richardson v. United States, 943 F.2d 1107, 1110 (9th Cir.1991).
 
 
 9
 The Federal Tort Claims Act subjects the United States to liability for torts by its employees, generally in the same manner and to the same extent as a private individual under like circumstances:
 
 
 10
 The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.
 
 
 11
 28 U.S.C. § 2674.
 
 
 12
 Subject to the provisions of chapter 171 of this title, the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.
 
 
 13
 28 U.S.C. § 1346(b)(1).
 
 
 14
 In addition to the statutory condition, that liability be measured by the extent to which a private person would be liable, there is a statutory exception for performance of discretionary functions:
 
 
 15
 The provisions of this chapter and section 1346(b) of this title shall not apply to--
 
 
 16
 (a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.
 
 
 17
 28 U.S.C. § 2680(a) (emphasis added).
 
 
 18
 As the statute expressly provides, so long as the federal agency or employee was performing a "discretionary function," the exception applies, even if the discretion was abused. The cases are, if used merely as a source of "rules" in the form of quotations, hard to apply, because they seem on their face somewhat contradictory, with a fair amount of backing and filling. Statements of law in cases are not statutes. They are explanations of why the court decided the particular case as it did. But when the facts of the cases are considered, the pattern becomes clear enough, and this case is plainly more analogous to the precedents holding that the discretionary function exception applies.
 
 
 19
 For purposes of analyzing the discretionary function question, we assume that the government should have discovered that the breakwater was not as high as it was meant to be, and failed to discover it only because it used outdated instruments. We also assume that had the Corps raised the breakwater two feet after discovering in 1985 that it was two feet lower than it was supposed to be, the 1988 storm would have done much less damage to Reuben's Restaurant. We further assume that the government's decision to put off the small improvement which would have raised the breakwater to design specifications, while it studied a much larger improvement, was a mistake in judgment and a failure to exercise reasonable care.
 
 
 20
 Despite these assumptions, we nevertheless feel compelled by controlling precedent to conclude that the discretionary function exception applies. The critical decision to which responsibility for the loss may be attributed was the one in 1985, to put off the smaller improvement while studying the possibility of a larger one. At that time, two and a half years before the storm which wrought the destruction, the Corps became aware of the subsidence, and the inadequate height of the breakwater. The issue, for the Corps, was what if anything to do about it, and when.
 
 
 21
 The Corps' statute directs it to consider the:
 
 
 22
 "desirability of commencing any and all improvements .... and in the consideration of such works and projects the Board shall have in view the amount and character of commerce ... which will be benefitted by the improvement, and the relation of the ultimate cost of such work ... and the public necessity for the work and propriety of its construction, continuance, or maintenance at the expense of the United States."
 
 
 23
 33 U.S.C. § 541. Note that the Corps is required by this statute to make a judgment balancing these sometimes conflicting considerations: (1) how much commerce benefits from the project; (2) what kind of commerce; (3) how much the project will cost; (4) how necessary is the work; (5) should the work be built, continued or maintained by the federal government, or some other entity.
 
 
 24
 In Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), the government negligently stored fertilizer in vessels in a Texas harbor. The fertilizer exploded and killed many people. Nevertheless, the Supreme Court held that the discretionary function exception to the Federal Tort Claims Act shielded the government from liability. The Court distinguished between "acts of a governmental nature or function" and "ordinary common-law torts." Id. at 27-28, 73 S.Ct. at 963-64. It noted that "Congress exercised care to protect the Government from claims, however negligently caused, that affected the governmental functions." Id. at 32, 73 S.Ct. at 966. Discretion, in this context, means "the discretion of the executive or the administrator to act according to one's judgment of the best course." Id. at 34, 73 S.Ct. at 967. It "includes determinations made by executives or administrators in establishing plans, specifications, or schedules of operations. Where there is room for policy judgment and decision there is discretion." Id. at 35-36, 73 S.Ct. at 968. The Court cited with approval a number of water destruction cases somewhat analogous to the one before us, such as property damage from changing the course of the Missouri, opening the gates of a dam, and releasing flood waters from a dam. Id. at 36 n. 32, 73 S.Ct. at 968 n. 32. Dalehite notes that the decisions in that case were made "at a planning rather than operational level." Id. at 42, 73 S.Ct. at 971. All the bad decisions which led to the catastrophe were made by the Field Director of Ammunition Plants, balancing safety against expense and reduced production, and that official's plan was faithfully carried out. The Court held that this planning error was insulated from liability. Id.
 
 
 25
 In Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), a ship was grounded because the government employees maintaining a lighthouse failed to check and repair a light in a government lighthouse, and negligently left the light out. The Court held against the government, but not on the discretionary function exception. The government had argued that the Federal Tort Claims Act held it liable "in the same manner and to the same extent as a private individual," and since no private individuals operated lighthouses, it could not be liable at all. Id. at 64-65, 76 S.Ct. at 124-25. The Court rejected the government's suggested inference that maintaining the light was an exclusively governmental function, which was therefore not subject to liability. Id., 350 U.S. at 64-65, 76 S.Ct. at 124-25. In Indian Towing, no one made a discretionary decision to leave the light out--the people who were supposed to maintain it simply failed to do so. Id.; see also Kennewick Irrigation District v. United States, 880 F.2d 1018, 1024 (9th Cir.1989) (quoting Berkovitz v. United States, 486 U.S. 531, 538 n. 3, 108 S.Ct. 1954, 1959 n. 3, 100 L.Ed.2d 531 (1988)).
 
 
 26
 In United States v. Varig Airlines, 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984), numerous people had been killed, 124 because of a bathroom fire in a commercial airplane, 4 because of a baggage compartment fire in an air taxi. The airplane owners sued the government for negligently issuing airworthiness certificates. The FAA had just spot-checked the plans and specifications, so it failed to spot the design errors that caused the accidents. The deficiencies were missed not because spot checks were negligently carried out, but because they were not adequate to discover all errors. Deciding to use spot checks rather than analyzing every detail of the plans was, the Court held, a discretionary function. The Court said Indian Towing did not implicate the discretionary function exception at all. Id. at 812, 104 S.Ct. at 2763-64. Cf. United States v. Gaubert, 499 U.S. 315, 326, 111 S.Ct. 1267, 1275-76, 113 L.Ed.2d 335 (1991); Berkovitz v. United States, 486 U.S. 531, 538 n. 3, 108 S.Ct. 1954, 1959 n. 3, 100 L.Ed.2d 531 (1988), Kennewick Irrigation District v. United States, 880 F.2d 1018, 1024 (9th Cir.1989). But Varig qualified the operational planning level distinction in Dalehite, by holding that "it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case." Id. at 813, 104 S.Ct. at 2764. The Court characterized the purpose of the exception as preventing "judicial 'second guessing' of legislative and administrative decisions grounded in social, economic and political policy through the medium of an action in tort." Id. at 814, 104 S.Ct. at 2765.
 
 
 27
 In Berkovitz v. United States, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988), a baby was paralyzed by a defective polio vaccine. His parents sued the government for licensing production and approving release of the vaccine. The Court held that both claims should survive a motion to dismiss under the discretionary function exception. Id. at 548, 108 S.Ct. at 1964-65. The reason was that in both cases, as pleaded, the claims could be understood to allege violation of existing policies, rather than formulation of policies which allowed the harm to occur. "When a suit charges an agency with failing to act in accord with a specific mandatory directive, the discretionary function exception does not apply." Id. at 544, 108 S.Ct. at 1963. The "nature of the conduct" test requires courts to "consider whether the action is a matter of choice for the acting employee." Id. at 536, 108 S.Ct. at 1958.
 
 
 28
 In United States v. Gaubert, 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991), government regulators trying to prevent bank failure had allegedly required two banks to merge, and then regulated the survivor into failure. Id. at 319, 111 S.Ct. at 1271-72. A major shareholder sued the government for destroying the value of his shares by commanding the mismanagement of his bank. Even though the bad judgments were made at the operational rather than the planning level of the agency, the discretionary function exception was held to apply. The reason was that "each of the regulatory actions in question involved the kind of policy judgment that the discretionary function exception was designed to shield." Id. at 332, 111 S.Ct. at 1278.
 
 
 29
 We applied this complex body of law in ARA Leisure Services v. United States, 831 F.2d 193 (9th Cir.1987). A tour bus in Denali National Park had rolled down a hill, killing 5 people and injuring 25. The reason was that there was no guardrail, the road had been allowed to erode from 28 feet to 14.6, and the shoulders were too soft to support the bus. We held that the lack of a guardrail could not give rise to liability, because of the discretionary function exception. The reason was that the National Park Service had made a policy decision to sacrifice human safety to esthetics. The guardrail was missing on purpose, so that the road would "lie[ ] lightly upon the land." Id. at 195. But the narrowness of the road and inadequate shoulders were not shielded from liability, because there was no policy to allow that deterioration, and Park Service policies instead required that park roads conform to the original alignments and be firm. We rejected the government's argument that budgetary constraints should shield its inadequate road maintenance, because "the fact that Park Service maintenance personnel were required to work within a budget does not make their failure to maintain Thoroughfare Pass a discretionary function...." Id.
 
 
 30
 In Kennewick Irrigation District v. United States, 880 F.2d 1018 (9th Cir.1989), the government negligently designed and built an irrigation canal, using silt without a concrete liner. This caused a train derailment resulting in extensive injuries and property damage. We held that the discretionary function exception applied to the design of the canal. The reason was that no policy required use of a concrete liner to keep the silt from washing away, and the government's design decision necessarily rested on a balancing of expense and quality. We took note of the "separation of powers concerns" raised in Varig and concluded that the exception had to apply, because there was no specific statute, regulation or policy requiring the government to design the irrigation canal in a manner which would have avoided the harm, and there was no violation of an established policy binding upon any particular government actor. Id. at 1021-22, 1027-28.
 
 
 31
 In Childers v. United States, 40 F.3d 973 (9th Cir.1995), an eleven year old died, allegedly because the National Park Service left a part of Yellowstone open in the winter without adequately warning of the dangerous condition of the trail where the boy died. We held that the discretionary function exception applied, because the applicable statutes and policies left it to the agency's discretion the balancing of preservation and public access, requiring discretionary judgment about what sorts of safety features to provide. Id. at 974-76.
 
 
 32
 In In re Glacier Bay; United Cook Inlet Drift Association v. Trinidad Corporation, 71 F.3d 1447 (9th Cir.1995), an oil tanker ran aground on a rock which was not shown in the nautical chart. The owners sued the government for negligence in preparing the chart. We held that the exception did not apply, because the government manual and instructions required the soundings every 50 meters, and they did not do that. We interpreted Berkovitz and Kennewick to require a two-step analysis: first, whether the challenged action involved an element of choice or judgment, and if not, whether a federal statute regulation or policy specifically prescribed a course of action for an employee to follow. Id. at 1450. Second, we were to consider whether the judgment involved considerations of social, economic or political policy such that Congress should be understood to have shielded it from judicial review. Id. "The proper question to ask is not whether the Government as a whole had discretion at any point, but whether its allegedly negligent agents did in each instance." Id. at 1451.
 
 
 33
 We are compelled to conclude that this case is more analogous to Dalehite, Varig, Gaubert, Kennewick, Childers, and the guardrail in ARA Leisure, than Berkovitz, Indian Towing, and Glacier Bay, and the road width and shoulder in ARA Leisure. The decision in our case necessarily involved the exercise of discretionary judgment to balance the five statutory factors that are supposed to inform Corps decisions. No regulation or policy required the Corps to do something that it failed to do. No individual violated any specific regulation or policy. People at the planning level, see Gaubert, 499 U.S. at 335, 111 S.Ct. at 1280 (Scalia, J. concurring), exercised discretionary judgment about what the Corps should do about the breakwater, and decided to do nothing for the time being, because they thought it wiser to roll the smaller repair into a bigger improvement later. Both parts of the Berkovitz test were satisfied. The Corps had statutory discretion, and the judgment was based on considerations of public policy.
 
 
 34
 There is an element which appears to make this case more like the road width in ARA Leisure than it really is. It was plain in ARA Leisure that the road was supposed to be 28 feet wide and was only 14 feet wide, and was supposed to have firm shoulders but instead had soft shoulders. ARA Leisure, 831 F.2d at 195. Likewise in the case at bar, the breakwater was supposed to be 14 feet high and it was only 12 feet high. That increased the force of the waves, which destroyed Reuben's Restaurant. But the legal difference is more significant than the factual similarity. In ARA Leisure, the regulation required the Park Service employees to keep the road shoulders firm and the road width at 28 feet. Id. In the case at bar, the breakwater height was specified in its design, but there was no regulation or policy requiring the Corps to monitor the breakwater height and assure that it continued to conform to its design specifications.
 
 
 35
 A word also needs to be said about cost. In ARA Leisure, we said that the agency could not invoke the discretionary function exception based on budgetary considerations, but in Kennewick we said that it could. In this case we also say that it could. These cases can be reconciled; whether the government can take cost into account depends on the applicable statutes, regulations, and policies. In ARA Leisure, the regulation required the Park Service to maintain the road width and firmness, not to balance that goal against what it would cost. In the case at bar, the statute expressly requires the Corps to consider the "relation of the ultimate cost of such work" to the other factors in deciding whether to do the work. 33 U.S.C. § 541. Where a statute or policy requires a particular government action, it has no discretionary function immunity based on its choice to spend its money doing something else instead. But where a statute or policy plainly requires the government to balance expense against other desiderata, then considering the cost of greater safety is a discretionary function.
 
 
 36
 Appellee argues that once the government built the breakwater, it was under a duty to maintain it in a safe condition. That may be a correct statement of tort law, but we are not persuaded that it is true as a matter of the discretionary function exception. No statute, regulation or policy required the Corps to do so, and the applicable statute expressly gave the Corps discretion about whether to do so.
 
 
 37
 None of this is to suggest that the discretionary decision the government made was right. Congress expressly made the discretionary function exception applicable even where there is an "abuse of discretion." The wrong which makes this case troubling is that the government created a man-made harbor, people invested great fortunes in reliance upon the safety of the harbor, yet because of discretionary decisions made by the government, their property was damaged. But reasonable reliance on the government does not necessarily give rise to governmental duty. Cf. Madera Irr. Dist. v. Hancock, 985 F.2d 1397, 1403 (9th Cir.1993). The government has an incentive to make itself reliable, because otherwise it must offer greater inducements and impose more coercion in order to elicit the conduct it desires. See id. at 1401. But it retains policy flexibility, in circumstances such as those of the case at bar.
 
 
 38
 We therefore conclude that the discretionary function exception to the Federal Tort Claims Act applied, so the district court lacked jurisdiction to award damages against the United States. Application of the exception is often troubling, because it may be a shield for carelessness and poor judgment. (We do not intimate that it was in this case.) Private actors generally must pay for the harm they do by carelessness. The government's power to tax enables it, better than any private actor, to perform its conduct with reasonable care for the safety of persons and property, and to spread the cost over all the beneficiaries if its conduct negligently causes harm. Fairness might seem to suggest that the government should be liable more broadly than private actors. But at its root, the discretionary function exception is about power, not fairness. The sovereign has, by the exercise of its authority, reserved to itself the right to act without liability for misjudgment and carelessness in the formulation of policy.
 
 
 39
 We do not reach the question whether there was negligence under California tort law, or the question on the cross-appeal of whether the insurer's recovery was properly limited by its administrative claim.
 
 
 40
 REVERSED.