Theresa M. THOMPSON, Plaintiff,

v.

Robert George DILGER, et al., Defendants.

Domenico and Elda GARGANI, Plaintiffs,

v.

UNITED STATES, et al., Defendants.

Civ. A. Nos. 88–197–A, 88–196–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Sept. 21, 1988.

John P. Ellis, Schwartz, Ellis & Sullivan, Ltd., Arlington, Va., for Gargani.

Michael S.J. Chernau, Nixon, Hargrave, Devans & Doyle, Washington, D.C., for Thompson.

Dennis E. Szybala, Asst. U.S. Atty., Alexandria, Va., for U.S.

Frank W. Dunham, Jr., Cohen, Gettings, Alper & Dunham, Arlington, Va., Robert E. Ellis, Fairfax, Va., for Dilger.

## MEMORANDUM OPINION

ELLIS, District Judge.

### Introduction

These essentially similar, consolidated cases arose from the same bizarre incident, an incident that confirms yet again that fact is often stranger than fiction. It happened on August 19, 1986, at the Texacare Service Station in Arlington, Virginia. On that day, defendant Robert G. Dilger, a retired Air Force Colonel with extensive experience in arms development and procurement, and a companion, defendant Joseph Donahue, drove into the service station to buy gasoline. Dilger and Donahue were in the Washington area to demonstrate an armor piercing rifle developed by Dilger with unofficial government encouragement, but without a government contract or official funding. The weapon was

in the car. It was loaded. Significantly, it was loaded with ammunition furnished to Dilger by government officials in contravention of government regulations and policies. Donahue and Dilger started handling the weapon. It fired, hit a gas pump and caused an explosion. Plaintiffs, claiming they were injured as a result, brought these actions. Against the individual defendants, plaintiffs bring negligence actions based on diversity jurisdiction. Against the United States, plaintiffs assert a number of negligence theories based on the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b). In essence, the FTCA theories are based on the following:

1. the negligence of Dilger who was alleged to be an "employee of the United States Government,"

2. the negligence of other United States employees in providing ammunition to Dilger,

3. the negligence of the government in wrongfully supporting the development, testing and transportation of the weapon, and

4. the negligence of the government in failing to supervise Dilger's transportation, storage and handling of the ammunition.

The government seeks summary judgment with respect to the first, third and fourth theories, apparently conceding for now that the second theory warrants a trial. The first theory falls, the government contends, because Dilger was not "an employee of the Government" under 28 U.S.C. § 2671. Against the third and fourth theories, the government asserts the "discretionary function exception" as set forth in 28 U.S.C. § 2680 and the elucidating cases. Since the dispositive facts are undisputed, summary judgment is appropriate. Fed.R.Civ.P. 56; *See Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). For the reasons stated in this Opinion, the Court grants summary judgment on these three FTCA theories.[1]

### Facts

The pertinent facts are as follows: defendant Robert George Dilger, a retired Air Force officer with extensive experience in the development and procurement of munitions, conceived an idea for a portable rifle (approximately eight and one-half feet in length) capable of piercing tank armor. Essentially, Dilger's idea involved taking a barrel that used GAU–8 ammunition, modifying it with a manual breech mechanism, and adding a sight so that it could fire surplus GAU–8 ammunition.

In 1985, at a social gathering in Washington, D.C., Dilger outlined his idea to William Bode, Special Assistant to the Undersecretary of State for Security Assistance, Science and Technology. Bode was in charge of guerilla activities for the Department of State and expressed interest in Dilger's idea. Subsequently, Bode introduced Dilger to Charles Bernard, Director of Land Warfare for the Department of Defense (DOD). Bernard was the head of DOD's Equipment Upgrade Program (Program) established for the purpose of supporting the development of light infantry weapons. It appears that the Program was intended to support the development of weaponry for use by the mujahedin against the Soviet Army in Afghanistan. Bernard, who was familiar with Dilger's munitions and armament expertise, expressed support for Dilger's project and indicated to Dilger that his portable armor piercing rifle project would be considered for funding once Congress appropriated funds for the Program. At the time, Con-

---

**1.** Plaintiffs and Dilger had also made two other claims which the Court rejected from the bench on the government's motion for summary judgment. Dilger had cross claimed against the United States on a theory of joint enterprise. Plaintiffs Garganis' complaint included an allegation that could be interpreted as a strict liability claim.

In granting summary judgment against these two claims, the Court noted that the FTCA sub-

jects the United States to liability only for "negligent or wrongful acts" of a federal employee. 28 U.S.C. § 1346(b). Claims of vicarious or strict liability are, therefore, excluded. *See also Laird v. Nelms,* 406 U.S. 797, 803, 92 S.Ct. 1899, 1902, 32 L.Ed.2d 499 (1972) (FTCA does not authorize imposition of strict liability claims); *Merklin v. United States,* 788 F.2d 172, 175 (3d Cir.1986) (the government is not liable under vicarious liability doctrines).

gress had already allocated $10,000 for the Program.

Although Dilger's project could not then be funded, Bernard decided to assist Dilger by arranging for the release of the GAU–8 ammunition necessary for testing the weapon. Dean Zerbe, a member of Congressman Dennis Smith's office, also assisted Dilger in obtaining ammunition for his project. In the fall of 1985, Bernard and Andrus Viilu, a program manager for Army Fire Support Systems, met with Walter Squire, Army Staff Specialist for Conventional Munitions, in order to obtain ammunition for Dilger's project. Squire contacted personnel with access to ammunition at Fort Dix and told them that Dilger was "involved in some kind of clandestine R & D type activity" and was "working for people at the highest levels of the Government." Squire then contacted Dale Adams who worked at Aerojet Ordinance Company in California, a manufacturer of GAU–8 ammunition. Squire asked Adams to provide ammunition for this project, stressing Dilger's reputation and the government's interest in the weapon. Aerojet agreed to modify an existing government contract to supply this additional ammunition provided that the government paid for it and provided that the shells were delivered to a government installation. Robert Trifiletti, a branch Chief in the Armament Research, Development and Engineering Center (AR-DEC) at Picatinny Arsenal, New Jersey, agreed to modify the existing government contract and authorized the shipment of 216 rounds of 30 mm ammunition to Fort Dix. Thereafter, a contracting official made the necessary alterations to the contract under the mistaken impression that the ammunition was to be used at a DOD test agency.

At Squire's request, the ammunition shipped from Aerojet was received by an ARDEC official at Ft. Dix, who released it to Dilger. Dilger then transported the ammunition to his home in the back of his truck. None of the regulations and paperwork requirements concerning the receipt and release of ammunition pursuant to a government contract were followed. An Army investigation following the accident concluded that the authorization and release of this ammunition was flatly contrary to Army policy and regulations.

Once Dilger received the ammunition, he worked on the weapon at his home in Ohio. He used other government contacts to obtain the gun barrels and sights. Significantly, he was neither supervised nor given safety instructions by federal officials or inspectors. In June of 1986, Bode sponsored several briefings on the weapon for representatives of various branches of government, including the Central Intelligence Agency, National Security Council, and Congress. Dilger also demonstrated early versions of the weapon at a farm in Virginia for the benefit of government officials, including representatives from DOD and CIA. These representatives expressed concern that Dilger was not conducting the demonstrations in a safe manner.[2] Yet none of these officials made any effort to admonish Dilger, nor did they take back the ammunition the government had provided.

Dilger continued work on the weapon until August 1986, though he still had not received either a government contract or any funding. On August 19, 1986, he was in the Washington metropolitan area in anticipation of a third demonstration of the weapon. After taking the weapon out to buy parts for the demonstration, Dilger and a companion, Joseph Donahue, stopped for gasoline at the Texacare Station on Columbia Pike in Arlington, Virginia. At the station, Donahue started handling the loaded rifle. Dilger then began to explain the weapon and as he picked it up, it discharged, striking a gas pump. An explosion followed, causing injury to plaintiffs and their property.

### Analysis

#### I.

■ Government liability for Dilger's acts turns on whether Dilger was, at the

---

**2.** Dilger had, for example, incautiously hammered on the breech and allowed cars to pass in front of the weapon when it was loaded.

time, an "employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). An "employee of the Government" is, in turn, defined to include:

> officers or employees of any federal agency, members of the military or naval forces of the United States, members of the National Guard while engaged in training or duty ..., and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation.

28 U.S.C. § 2671. There is no contention that Dilger was an officer or employee of a federal agency, or an active member of the military forces. Plaintiffs concede that their FTCA claim for Dilger's acts survives only if they successfully establish that Dilger was a "person acting on behalf of a federal agency in an official capacity." This, as is now clear, they cannot do, and hence the FTCA claim for Dilger's acts fails. While there is no controlling authority directly in point, well-established principles hold that a person does not act on behalf of a federal agency in an official capacity where, as here, there is no governmental authority to supervise the person's daily activities.

The Supreme Court in *Logue v. United States*, 412 U.S. 521, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973), held that a person is not an "employee of the Government" unless the government has the authority to supervise the day-to-day activities of that individual. *See Logue*, 412 U.S. at 527–28, 93 S.Ct. at 2219–20 (citing *Maryland v. United States*, 381 U.S. 41, 85 S.Ct. 1293, 14 L.Ed.2d 205 (1965)). Cases following this principle are legion.[3] In *Logue*, the government was not liable for the negligence of county jail employees resulting in the suicide of a prisoner. The county jail had a contract with the Federal Bureau of Prisons and was subject to federal regulations. Nonetheless, the Court found the county jail to be an independent contractor, not a federal employee, because the Federal Bureau of Prisons did not supervise the physical performance of its duties. *See Logue*, 412 U.S. at 529–30, 93 S.Ct. at 2220–21. Using the same rationale, the Court also held that the employees of the county jail were not "acting on behalf of the Government" as contemplated by Congress in 28 U.S.C. § 2671. *Id.*

Plaintiffs argue that the *Logue* test only applies when the issue is whether an individual or organization sued under the FTCA should be characterized as the employee of a federal agency or as an independent contractor. This argument is unsupported in principle, policy or precedent. Indeed, the two cases relied upon by plaintiffs in support of this argument, *Witt v. United States*, 462 F.2d 1261 (2d Cir.1972), and *Close v. United States*, 397 F.2d 686 (D.C.Cir.1968), were essentially overruled

---

**3.** *See, e.g., United States v. Orleans*, 425 U.S. 807, 814–5, 96 S.Ct. 1971, 1976–77, 48 L.Ed.2d 390 (1976) (*Logue* test applied to determine that community agency which received federal grant and was required to comply with federal regulations not an "employee of the Government"); *Letnes v. United States*, 820 F.2d 1517 (9th Cir. 1987) (applied substantial supervision test to determine that co-pilot under contract with the Forest Service not an "employee of the Government"; *Cavazos By and Through Cavazos v. U.S.*, 776 F.2d 1263 (5th Cir.1985) (retired military personnel, serving as Junior Reserve Officer Training Corps instructors, not employees of the Government under the *Logue* test); *Lurch v. U.S.*, 719 F.2d 333 (10th Cir.), *cert. denied* 466 U.S. 927, 104 S.Ct. 1710, 80 L.Ed.2d 182 (1983) (surgeon working for university under contract with Veteran's Administration not governmental employee); *Wood v. Standard Products Co., Inc.*, 671 F.2d 825 (4th Cir.1982) (control test applied to determine that physician hired under Public Health Service contract not an "employee of Government"); *Cannon v. U.S.*, 645 F.2d 1128 (D.C.Cir.1981) ("control test" applied to determine that Lorton employees not employees of the Government); *Alexander v. United States*, 605 F.2d 828 (5th Cir.1979) (manufacturer of munitions not an "employee of the Government" even though facility was owned by the Government, the Government required compliance with Army regulations, and the Government conducted safety monitoring functions in the plant); *Harris v. U.S.*, 424 F.Supp. 627 (D.Mass.1976) (management broker with contract to manage building owned by HUD not an "employee of the Government").

by *Logue*. *See Logue*, 412 U.S. at 532 n. 8, 93 S.Ct. at 2222 n. 8. Although *Logue* focused more sharply on the distinction between independent contractors and federal agency employees, the opinion also addressed the argument that an independent contractor could nonetheless be acting on behalf of the government. The Court conceded that the legislative history shed little light on the congressional purpose behind the "acting on behalf" language of the statute. Still, it agreed with the government's contention

> that the language is designed to cover special situations such as the "dollar-a-year" man who is in the service of the Government without pay, or an employee of another employer *who is placed under direct supervision of a federal agency pursuant to contract or other arrangement.*

*Logue*, 412 U.S. at 531, 93 S.Ct. at 2221 (emphasis added). Thus, *Logue* indicates that the inclusion of the "acting on behalf of the Government" language does not detract from the central requirement of governmental supervision or control. Absent governmental authority to supervise or control a person's daily activities, that person cannot be an "employee of the Government" under the FTCA.

Plaintiffs assert that the government officials and Dilger were intimately bound together in a clandestine plan to build the armor piercing rifle. Plaintiffs also admit, however, that while the government supplied ammunition for Dilger's project, it decided not to supervise or control his activities and, in fact, did not do so. Indeed, this failure to supervise is the crux of plaintiffs' complaint. In sum, under *Logue* and its progeny the test for determining whether an individual is an "employee of the Government" is whether the government supervised the individual's day-to-day conduct. Plaintiffs admit that the government did not supervise Dilger's activities. Hence, it follows that Dilger cannot be deemed to be an "employee of the Government" under the FTCA.

## II.

■ The United States also seeks partial summary judgment against plaintiffs' claims that government officials acted negligently (1) in aiding and encouraging Dilger in his development and procurement of the weapon and (2) in failing to supervise Dilger's development and procurement of the weapon once it furnished him with ammunition. The discretionary function exception bars these theories. That exception is embodied in the following section which provides that the FTCA is inapplicable to

> [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). While there is no single test for distinguishing a discretionary from a non-discretionary act, a consistent line of Supreme Court decisions provides helpful guidelines.

The Supreme Court first addressed the scope of the "discretionary function exception" in *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). In *Dalehite*, the Court instructed that it was the nature of the conduct, rather than the status of the employee, that determined whether the conduct was discretionary:

> It is unnecessary to define, apart from this case, precisely where discretion ends. It is enough to hold, as we do, that the 'discretionary function or duty' that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. *Where there is room for policy judgments and decisions there is discretion.*

*Dalehite,* 346 U.S. at 35–36, 73 S.Ct. at 967–68 (emphasis added). Thus, if the conduct involves a policy decision, it is protected by the exception. *Id.*[4] Petitioners in *Dalehite* had claimed that the government was liable for an explosion of a fertilizer manufactured and shipped by federal contractors under the general supervision of the Department of the Army. Specifically, petitioners claimed that the government negligently initiated the program, negligently designed and approved inadequate specifications, and negligently supervised the storage and shipment of the fertilizer. The Court held that these actions were immune from liability because they followed a policy judgment made by officials who had the authority to make such a judgment. *See Dalehite,* 346 U.S. at 41–42, 73 S.Ct. at 970–71.

More recently, the Court, in *United States v. S.A. Empresa de Viacao Arerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984), has further defined the scope of the discretionary function exception.[5] *Varig Airlines* teaches that, in determining whether alleged conduct is immune from liability, courts must consider the legislative intent in crafting the exception: specifically, Congress sought to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic and political policy through the medium of an action in tort." *See id.* at 813, 104 S.Ct. at 2764.[6] In that case, respondents sued the Federal Aviation Administration (FAA) after the crash of an FAA-certified airplane with a design defect. The "spot-check" method of inspection adopted by FAA administrators failed to uncover the particular defect that caused the crash. *See id.* at 820. The Court, however, identified the FAA's adoption of the "spot-check" inspection method as precisely the kind of decision that Congress intended to shield from liability; that decision involved the FAA's weighing of a variety of policy considerations.[7] *See id.* at 819, 104 S.Ct. at 2767.

---

**4.** *See also Berkovitz v. United States,* — U.S. —, 108 S.Ct. 1954, 1960, 100 L.Ed.2d 531 (1988); *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 811, 104 S.Ct. 2755, 2763, 81 L.Ed.2d 660 (1984); *Patterson v. United States,* 856 F.2d 670, 673–74 (4th Cir.1988); *K.W. Thompson Tool Co., Inc. v. United States,* 836 F.2d 721, 724–26 (1st Cir.1988); *Gordon v. Lykes Bros. S.S. Co., Inc.,* 835 F.2d 96, 99 (5th Cir.1988); *Galloway Farms, Inc. v. United States,* 834 F.2d 998, 1004 (D.C. Cir.1987); *In re Agent Orange Product Liability Litigation,* 818 F.2d 210, 215 (2nd Cir.1987); *Bacon v. United States,* 810 F.2d 827, 829 (8th Cir.1987); *Wright v. United States,* 719 F.2d 1032, 1035 (9th Cir.1983); *Nevin v. United States,* 696 F.2d 1229, 1230 (9th Cir.), *cert. denied,* 464 U.S. 815, 104 S.Ct. 70, 78 L.Ed.2d 84 (1983).

**5.** The *Varig Airlines* Court explicitly reaffirmed *Dalehite,* rejecting petitioners' contention that *Dalehite* had been overruled by *Indian Towing Co. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955) (holding that proper maintenance of lighthouse, once Coast Guard decided to install and operate it, was not a discretionary function), and *Eastern Air Lines, Inc. v. Union Trust Co.,* 221 F.2d 62 (D.C.Cir.), *summarily aff'd sub nom., United States v. Union Trust Co.,* 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 796 (1955) (holding that negligent acts of air traffic controllers were not discretionary). *See Varig Airlines,* 467 U.S. at 811–12, 104 S.Ct. at 2763–64 ("While the Court's reading of the Act admittedly has not followed a straight line, we do not accept the supposition that *Dalehite* no longer represents a valid interpretation of the discretionary function.").

**6.** The legislative history explains that

[i]t is neither desirable nor intended that the constitutionality of legislation, the legality of regulations, or the propriety of a discretionary administrative act should be tested through the medium of a damage suit for tort. The same holds true of other administrative action not of a regulatory nature, such as the expenditures of Federal funds, the execution of a Federal project, and the like.

On the other hand, the common law torts of employees of regulatory agencies, as well as of all other Federal agencies, would be included within the scope of the bill.

Hearings on H.R. 5373 and H.R. 6463 Before the House Committee on the Judiciary, 77th Cong., 2d Sess., 28, 33 (1942) (statement of Asst. Att'y Gen. Francis M. Shea). *See also Berkovitz,* — U.S. at —, 108 S.Ct. at 1959; *Varig Airlines,* 467 U.S. at 810, 104 S.Ct. at 2762; *Dalehite* 346 U.S. at 27, 73 S.Ct. at 963.

**7.** The Court also concluded that "whatever else the discretionary function exception may include it plainly was intended to encompass the discretionary acts of the Government acting in its role as a regulator of private individuals." *Id.* at 813–14, 104 S.Ct. at 2764–65. *See also Begay v. United States,* 768 F.2d 1059 (9th Cir. 1985). Thus, the promulgation of regulations constitutes one of the purest examples of a discretionary function.

The discretionary function exception, therefore, protected the actions of the FAA officials. *See id.* at 820, 104 S.Ct. at 2768.

In *Berkovitz v. United States,* —— U.S. ——, 108 S.Ct. 1954 (1988), the Court reaffirmed *Dalehite* and *Varig Airlines,* but put the boundaries of the exception into sharper focus: "the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow" and the employee fails to "adhere to the directive." *Id.* at 1958–59. This conclusion follows from the instruction in *Dalehite* that an element of choice or policy judgment is an essential prerequisite to a discretionary function. *See id.* (citing *Dalehite,* 346 U.S. at 35–36, 73 S.Ct. at 967–68). Acts that are contrary to federal statutes, regulations, or protected policy decisions are, therefore, not immune from liability.[8] Applying this rationale to the facts in *Berkowitz,* the Supreme Court held that the negligent licensing of a vaccine without the requisite determination of compliance with agency standards was not a discretionary function and was, therefore, subject to FTCA liability. *See id.* at 1964.

Guided by the principles set forth in *Dalehite, Varig Airlines,* and *Berkovitz,* this Court finds that the selection, aid, and encouragement of Dilger's project in this case fall squarely within the discretionary function exception. Mr. Bode was responsible for the implementation of a program to supply allies with cost-efficient and useful weapons technology. Similarly, Mr. Bernard directed a classified Equipment Upgrade Program within the DOD that supported projects to modify existing armaments. Bode and Bernard both had broad discretion in selecting which weapons to support. Their decision to support Dilger's project was, therefore, precisely the type of decision that Congress intended to protect under the discretionary function exception.[9] The fact that this choice may have been made negligently is irrelevant. *See* 28 U.S.C. § 2680(a). Moreover, actions of their subordinates which conform to their choice of Dilger's project for assistance are derivatively protected by the exception. *See Berkovitz,* 108 S.Ct. at 1958; *Dalehite,* 346 U.S. at 35–36, 73 S.Ct. at 967–68.

The protective umbrella of the discretionary function exception similarly shields from FTCA liability the government's failure to supervise Dilger once it provided him with ammunition. In accordance with *Berkovitz,* the Court must first determine whether federal regulations required supervision of Dilger's transportation, storage, and use of the ammunition. *See Berkovitz,* 108 S.Ct. at 1958–59. If specific regulations dictated supervision by these

---

8. *See, e.g., Mandel v. United States,* 793 F.2d 964, (8th Cir.1986) (the National Park Services' failure to comply with previously adopted safety policy was not discretionary); *Aslakson v. United States,* 790 F.2d 688, 692–94 (8th Cir.1986) (agency officials' failure to comply with their own safety policy not barred by discretionary function exception); *Madison v. United States,* 679 F.2d 736 (8th Cir.1982), *aff'd sub nom McMichael v. United States,* 751 F.2d 303 (8th Cir.1985), *aff'd on rehearing* No. 87–1635 (8th Cir.1988) (DOD inspectors' failure to take prescribed action in event of electrical storm at munitions plant not barred by discretionary function exception); *Aretz v. United States,* 604 F.2d 417 (5th Cir.1979) (failure to notify contractor of change in classification of explosive was contrary to standard operating procedure and, therefore, not a discretionary function); *Griffin v. United States,* 500 F.2d 1059 (3rd Cir. 1974) (failure to comply with regulations governing testing of polio vaccine not discretionary); *cf. Allen v. United States,* 816 F.2d 1417,

1421 (10th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 694, 98 L.Ed.2d 647 (1988) (agency actions barred by discretionary function exception where plaintiffs submitted no evidence that personnel failed to implement specific procedures mandated by agency guidelines); *Cole v. United States,* 651 F.Supp. 221 (N.D.Fla.1986) (regulations gave head of procuring agency the discretion to omit clause incorporating safety standards because the contract was for "standard commercial items" with a value of less than $10,000).

9. The Government also argued that the decision to offer to an individual or firm a formal contract falls within the discretionary function. *See, e.g., Scanwell Laboratories, Inc. v. Thomas,* 521 F.2d 941, 948 (D.C.Cir.1975), *cert. denied,* 425 U.S. 910, 96 S.Ct. 1507, 47 L.Ed.2d 761 (1976); *Gowdy v. United States,* 412 F.2d 525 (6th Cir.), *cert. denied,* 396 U.S. 960, 90 S.Ct. 437, 24 L.Ed.2d 425 (1969). Plaintiffs conceded this point during oral argument.

officials,[10] there would be, in that event, no element of choice as to supervision. The government's failure to supervise would then not be protected by the exception.

The Court, however, has found no regulations or specific policy directives that govern the actions of those government officials working with Dilger because Dilger was not bound by a government contract. Plaintiffs argue that government officials failed to comply with Defense Federal Acquisition Regulation (DFAR) 23.-7002.[11] Pursuant to that regulation, certain safety standards, enumerated in DOD Instruction (DODI) 4145.26–M, must be "applied to all *contracts* involving ammunition or explosives." *See* DFAR Supplement, 23.7001 *et seq.* (emphasis added). DODI 4145.26–M requires, for example, that contracting officers conduct a pre-award investigation of the contract offeror's facilities to determine whether the offeror can comply with safety standards. *See* "DOD Contractors' Safety Requirements for Ammunition and Explosives," DODI 4145.26–M. Similarly, plaintiffs allege that DFAR 23.71 required the government officials to evaluate and certify the prospective contractor's ability to safe-

guard the ammunition. *See* DFAR Supp. 23.7103(b). These provisions, however, apply only to government contractors. Both parties agree that Dilger never received a contract from the government. Accordingly, the Court finds that these regulations did not *require* official government supervision of Dilger's transportation, storage, and use of the ammunition.[12]

In sum, the officials who chose to encourage and support Dilger also had the discretion to determine whether to supervise Dilger's activities and, if they chose to do so, to select the appropriate degree of supervision.[13] Their decision not to supervise is, therefore, not actionable under the FTCA. The Court refuses to impute a contract where none existed in order to strip the government of the protection afforded by the discretionary function exception.

For these reasons, the Court grants the government's motion for partial summary judgment. Specifically, summary judgment is granted as to plaintiffs' allegations of negligence (1) on the part of Dilger, as an alleged government employee, and (2) by the government, in wrongfully support-

10. The adequacy of such regulations is not at issue; decisions made in the regulatory process are protected by the discretionary function exception. For example, if the government simply reserves a right to inspect and relinquishes primary responsibility for safety to the contractor, that decision is protected. *See Fortney v. United States*, 659 F.Supp. 127 (W.D.Va.1987), *aff'd*, 841 F.2d 1127 (4th Cir.1988). *See also supra* note 7.

11. Actually, counsel for Thompson alleged that the government violated Armed Services Procurement Regulation (ASPR) 7–104.79. This regulation, however, was no longer in effect at the time of the alleged negligent activities in this case. DFAR 23.7002 replaced ASPR 7–104.79 and was applicable during the relevant time period.

12. The Court also agrees with the government's argument that even assuming a contract between Dilger and DOD, this particular regulation permits the contracting officer to determine the extent of supervision over the contractor's work. Moreover, these regulations apply only to rounds of 40 mm ammunition, *see* DODI subpart 23.7100 (referring to DODI 5220.30); Dilger was supplied with rounds of 30 mm am-

munition. Arguably, therefore, the regulations would not apply to Dilger's project. The Court's holding rests, however, on the fact that Dilger did not have a contract with the government.

13. The Court's decision today is consistent with the Fourth Circuit's recent decision in *Patterson v. United States*, 856 F.2d 670 (4th Cir.1988). In *Patterson*, the Fourth Circuit found that the discretionary function exception did not protect "lower-level ministerial acts," such as routine investigations or inspections, that serve merely to gather information for subsequent discretionary decisions to allocate the resources of the Office of Surface Mining. *Id.* at 674. The on-site inspections at issue were conducted by field investigators whose authority was strictly limited to reporting, without recommendations or conclusions, their findings relating to a particular site. *Id.* at 674. The limited discretion exercised by the inspectors in making such findings did not, therefore, rise to the "nature and quality [of discretion] that Congress intended to shield from tort liability." *Id.* In contrast, the Court has found in the instant case sufficient discretionary authority to trigger the discretionary function exception; thus, the Court's ruling today is consistent with *Patterson*.

ing and in failing to properly supervise Dilger's weapon project.

An appropriate order will be entered.