**David Wilson McKEEL, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. AMD 99–2811.**

United States District Court, D. Maryland.

Dec. 19, 2001.

H. Russell Smouse, George Levi Russell, III, Glenn Edward Mintzer, Joshua J. Kassner, Law Offices of Peter G. Angelos, Baltimore, MD, for plaintiff.

Leland S. Van Koten, U.S. Department of Justice, Washington, DC, Nadira Clarke, Office of the U.S. Attorney, Baltimore, MD, James Charles Brennan, U.S. Department of Justice, Civil Division—Environmental Torts, Washington, DC, for defendant.

## MEMORANDUM

DAVIS, District Judge.

In this lawsuit, plaintiff David Wilson McKeel alleges that he contracted a disabling pulmonary condition—bronchiolitis—as a result of his exposure to polycholorinated byphenyls ("PCBs")[1] while he was work-

---

1. "PCBs are mixtures of synthetic organic chemicals with the same basic chemical structure and similar physical properties ranging from oily liquids to waxy solids. Due to their non-flammability, chemical stability, high boiling point and electrical insulating properties, PCBs were used in hundreds of industrial and commercial applications including electrical, heat transfer, and hydraulic equipment; as plasticizers in paints, plastics and rubber products; in pigments, dyes and carbonless copy paper and many other applications." ENVT'L PROTECTION AGENCY, PCB HOME PAGE *at, http://www.epa.gov/oppt-intr/pcb/* (last visited Dec. 5, 2001). In animals, PCBs have been shown to cause cancer

ing as a sheet-metal worker in a government building located at the United States Army's Aberdeen Proving Ground, in Aberdeen, Maryland ("Army"). McKeel has sued the United States of America ("the government") under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.* Now pending are the government's motions (1) to dismiss for lack of subject matter jurisdiction pursuant to Fed. R.Civ.P. 12(b)(1) and (2) for summary judgment pursuant to Fed.R.Civ.P. 56. The motions have been fully briefed and no hearing is necessary. Local Rule 105.6. I shall grant the government's motion to dismiss; the motion for summary judgement is therefore moot.[2]

(i)

■ The determination of jurisdiction is a threshold issue, requiring me to resolve the government's motion to dismiss at the outset. *See Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) ("Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." (internal quotations omitted)). When the government challenges the court's subject matter jurisdiction, the plaintiff bears the burden of persuasion and must demonstrate an unequivocal waiver of sovereign immunity. *See Williams v. United States,* 50 F.3d 299, 304 (4th Cir.1995). In ruling on a 12(b)(1) motion, the court is free to consider and to weigh evidence outside of the pleadings to determine its power to hear the case. *Id.*

(ii)

In 1984 the Army began receiving complaints from employees regarding dust falling from the air diffusers at the Army's Aberdeen research laboratory, Building E–3100 ("the building"). Thomas Caldwell ("Caldwell"), an air conditioning mechanic, determined that the source of the dust was deteriorating felt insulation located within the ventilation system. *Caldwell Dep.* at 29–30. According to Caldwell, the deteriorating insulation originated in the air handlers, which were located on the roof of the building. *Id.* at 31. As a temporary solution, filters were installed to reduce the amount of the dust falling into offices from the air diffusers. *Id.* at 31–33. The air handlers were replaced and the Army decided to solicit bids to retrofit and rebalance the existing air conditioning and heating ducts in the building.

On August 16, 1989, the Army issued a solicitation to prospective bidders. On or about September 15, 1989, the Army received its only bid to perform the work from Horton Mechanical Contractors, Inc. ("Horton"). Because Horton was the sole bidder for the project, the Army converted the solicitation to a negotiated procurement action and requested that Horton submit a revised bid, and Horton did so on September 25, 1989.

The performance of the contract entailed, *inter alia,* sheet-metal work. To perform the necessary sheet-metal work on the ducts, Horton retained BTR Sheetmetal, Inc. ("BTR"). McKeel, a sheet-metal worker, was employed by BTR and worked on the air conditioning and heating ducts in Building E–3100 from ap-

in addition to a number of serious non-cancer health effects including effects on the immune system, reproductive system, nervous system, and endocrine system. *Id.*

2. The motion for summary judgment is joined with a motion to exclude the plaintiff's expert opinion testimony on general and specific causation. If this case were to go to trial, even if the expert testimony were admitted, its probative value would appear to be zero.

proximately July 1990 until September 1990. *McKeel Decl.* at ¶ 2. McKeel's tasks included cleaning, removing and replacing old duct work. During the course of the work, gray dust fell from the air ducts. McKeel and his co-workers (and others) complained to government personnel about this "falling dust." *Amended Compl.* at ¶ 20. According to McKeel, after complaints from various workers were voiced, the building manager directed McKeel to collect a sample of the material for testing. *McKeel Decl.* at ¶ 4. These tests revealed that the dust contained a PCB level of 50 parts per million. *Boisseau Dep.* at ¶ 41. Subsequent to the initial testing, McKeel contends that he was directed by the building manager and by Donald Wayne Naff ("Naff"), the government's construction representative, to gather additional samples for further testing and he did so by cutting six by six-inch holes in the ducts. *McKeel Decl.* at ¶ 5.

On August 29, 1990, a safety and occupational health specialist conducted a site visit, and thereafter recommended that a qualified contractor in PCB removal be engaged. Pl.'s Ex. 16 at 3a. On August 30, 1990, a "stop work" order was issued and the Army Environmental Hygiene Agency took over the work site to perform testing. Soon after the stop work order was issued, McKeel claims he began having difficulty breathing. McKeel eventually filed a worker's compensation claim alleging occupational exposure to chemicals and he was awarded benefits.

(iii)

The gravamen of McKeel's claims is that government officials negligently caused his exposure to harmful chemicals, negligently failed to warn him of a potential hazard in the performance of his work and, more specifically, negligently failed to advise him that he should wear protective clothing while he collected the samples. By way of his amended complaint, McKeel also asserts a "negligent misrepresentation" claim.

The FTCA provides a waiver of federal sovereign immunity for tort claims. 28 U.S.C. § 2674. This waiver is constrained by an extensive list of exceptions. At issue here are the "independent contractor" exception, "discretionary function" exception and the "misrepresentation" exception. *See* 28 U.S.C. §§ 1346(b)(1), 2680(a), 2680(h).

*The Independent Contractor Exception*

■ The plain language of the FTCA insulates the government from liability arising out of tortious conduct by independent contractors. 28 U.S.C. § 1346(b). Whether an entity is an independent contractor is a question of federal law. *Logue v. United States*, 412 U.S. 521, 528, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973). In determining whether an entity is an independent contractor the critical inquiry is whether the government has the power "to control the detailed physical performance of the contractor," *United States v. Orleans*, 425 U.S. 807, 814, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976) (quoting *Logue*, 412 U.S. at 528, 93 S.Ct. 2215), or whether the government supervises the "day-to-day" operations of the project. *See Logue*, 412 U.S. at 530, 93 S.Ct. 2215. In sum, to avoid the bar of the independent contractor exception, a claimant must establish that the government "managed the details" or ran the "daily routine" of the activities constituting the alleged tortious conduct. *See Williams*, 50 F.3d at 306–7(citations omitted).

■ The government argues that, under the facts here, McKeel's negligence claims, including his failure to warn claims, are barred by the independent contractor exception. I agree. There is no dispute that Horton was hired by the government as a

general contractor, and Horton subsequently engaged BTR as a subcontractor; manifestly, each is an independent contractor under the circumstances of this case. McKeel contends, however, that the independent contractor exception does not apply because the government controlled the "day-to-day" activities of Horton and BTR with regard to safety and quality of the work. More specifically, McKeel relies on the following four factors in support of his contention that the government exercised day-to-day control over the project: (1) the government had the right to "suspend, delay, or interrupt all or part of the work" at any given time; (2) the government was responsible for inspecting the job site to determine whether workers were safe; (3) the government directed and supervised the sampling of the dust falling from the ducts; and (4) the government had the responsibility to test unknown substances. *Pl.'s Opp.* at 13–14. Plaintiff's argument is unavailing.

With regard to the first two factors, namely the government's right to stop the work at any time and the government's responsibility to inspect the work, the case law is abundantly clear that such factors do not establish sufficient control over "day-to-day" operations. *See Williams*, 50 F.3d at 306–7(explaining that the government's right to ensure compliance with federal standards or to inspect job sites or job performance periodically does not amount to control of day-to-day operations); *see also Berkman v. United States*, 957 F.2d 108, 113–4 (4th Cir.1992) (reasoning that the government's right to approve work schedules of a maintenance contractor, inspect the job site to ensure compli-

ance, and supervise certain cleaning tasks did not amount to day-to-day control).

Furthermore, the plain language of the contract awarded to Horton clearly establishes that the contractor assumed the responsibility for protecting workers on the site.[3] First, the contract explicitly states:

> The Contractor shall control construction quality by conducting daily inspection of the phases of construction in progress and shall provide the Contracting Officer in a weekly inspection report results of these inspections . . . .

Contract, Exh. 8 to Pl.'s Brief, § 01401. Second, the terms of the contract required the contractor to ensure compliance with safety regulations, stating that the "contractor shall . . . execute constant supervision to ensure full and immediate compliance with pertinent provisions of . . . safety regulations." *Id.* at § 01011. Third, the contract explicitly placed responsibility on the contractor in the event that a potential hazard was uncovered. The contract states:

> [D]uring operations, such as excavation or demolition, materials may be uncovered which could be hazardous (e.g. asbestos). Contractor personnel, if they encounter unrecognized or unknown materials in which they are unsure of possible contamination or actions to take, shall immediately discontinue work in that area, and shall notify, through the Contracting Officer or his representative, the installation Safety Office . . . .

*Id.* In view of these provisions, therefore, the first two factors cited by McKeel as

---

**3.** The record does not establish whether Horton delegated any safety responsibilities to BTR under their subcontract regarding the sheet-metal work. Therefore, for the purposes of this matter, I will assume that both Horton and BTR retained the duty to ensure

the safety of their employees. Further, any arrangement between Horton and BTR with regard to ensuring the safety of their workers would not affect the government's effective delegation of this responsibility.

probative of the government's day-to-day control are not persuasive.

As to McKeel's contention that the government's directives to collect samples of the suspicious material demonstrate the government's day-to day control, the record contains no evidence that the Army supervised the collection of the samples, i.e., what equipment was to be used or what gear was worn.[4] In fact, McKeel apparently concedes that the instruction by the government to drill holes for the purposes of collecting dust, by itself, is insufficient to impute liability to the government. *See Pl.'s Opp.* at 14 ("While any one of these factors may not be sufficient to demonstrate the inapplicability of the independent contractor exception, collectively [they do]."). Thus, to the extent that McKeel attempts to impute liability to the government for the alleged negligence of Horton or BTR with regard to ensuring his safety in obtaining samples of the material, such claims are barred by the independent contractor exception.

The government also correctly contends that the independent contractor exception bars McKeel's claims that the government breached an alleged duty to warn invitees of dangers on its premises. McKeel argues that because the government never delegated the duty to warn of "a possible danger, namely the deteriorating insulation," the independent contractor exception is inapplicable. McKeel's argument fails, however; the language of the contract is clear. The contract disclosed to Horton that workers could encounter hazardous substances during the course of the project. In addition, provisions of the contract specifically delegated all safety matters to Horton. Consequently, the government did not retain any duty to warn about the deteriorating insulation.

■ McKeel argues in the alternative that even assuming that the job site was not within the control of the Army, the government is nevertheless liable because it had a nondelegable duty to warn invitees of dangers located on the premises because an owner of property has a nondelegable duty. I must reject this argument, however. The Fourth Circuit explained in *Berkman*, 957 F.2d at 112–13, that the FTCA exception for independent contractors preempts state law nondelegable duties. *See also Roditis v. United States*, 122 F.3d 108, 111 (2nd Cir.1997) (explaining that "in adopting the independent contractor exception to liability, Congress did not simultaneously adopt the exceptions to that doctrine"), *cert. denied*, 523 U.S. 1095, 118 S.Ct. 1562, 140 L.Ed.2d 794 (1998); *Norman v. United States*, 111 F.3d 356 (3rd Cir.1997) (declining to follow *Dickerson, infra* ) (adopting the Fourth Circuit's reasoning that a state nondelegable duty cannot override the sovereign immunity of the United States); *Clark v. United States*, 52 F.3d 1122 (D.C.Cir.1995) (unpublished) ("[T]he nondelegable duty doctrine is inapplicable to cases arising under

---

4. The record lacks all details surrounding these alleged government directives. McKeel simply states the following:

I was directed to cut various six inch by six inch holes in the duct work in the building for the purpose of collection of additional samples of material found in the duct work. I performed these tests at the direction of various government employees including Vicky Schafer and Wayne Naff. Finally during the course of my assisting the government in the collection of samples I was never instructed to wear any protective clothing or otherwise warned of any potential hazard.

*McKeel Decl.* at ¶5. These bare allegations, without any facts describing the circumstances in which these directives were given, simply do not support the contention that the government took over from Horton and or BTR their contractual responsibility for worker safety on the job site.

the Federal Tort Claims Act because federal law does not permit the application to the United States of a generalized state-defined duty."); *but see Dickerson, Inc. v. United States*, 875 F.2d 1577, 1582–83 (11th Cir.1989)(holding that the independent contractor exception does not protect the government from contractor's negligence if the duty was nondelegable under state law). Therefore, McKeel's argument that liability can be imputed to the government because of state nondelegable duty doctrine must fail.

*Discretionary Function Exception*

■ McKeel seems to advance one theory of liability which is arguably rooted in acts and omissions of government employees involving duties existing outside of those delegated in the contract for the work: he contends that the government was negligent in its failure to cordon off the areas containing the deteriorating insulation and in failing to conduct testing in advance of the work. The government maintains, however, that if this theory is analytically distinct from McKeel's other claims, it is not liable for this alleged tortious conduct by virtue of the discretionary function exception provided for in the FTCA. I agree that the discretionary function exception applies to the government's decision not to "sample, test and/or have the premises cordoned off" when it discovered the deteriorating insulation within the ventilation system.

■ The Fourth Circuit has consistently held that the discretionary function exception provides a broad form of protection for the United States, limiting liability of the government under the FTCA. *Bowman v. United States*, 820 F.2d 1393 (4th Cir.1987). By its express terms, the FTCA does not impose liability upon the United States for acts or omissions of government employees "based upon the exer-

cise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The exception does not apply, however, if "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Williams*, 50 F.3d at 309 (quoting *Berkovitz v. United States*, 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988)); *see, e.g., In re Sabin*, 984 F.2d 124 (4th Cir.1993) (violation of standards regarding testing of polio vaccine); *Musick v. United States*, 768 F.Supp. 183 (W.D.Va.1991) (violation by Air Force pilot of mandatory squadron policy regarding minimum flying altitude).

■ The Supreme Court adopted a two-pronged test for determining the applicability of this exception in *Berkovitz*, 486 U.S. at 537, 108 S.Ct. 1954, and *United States v. Gaubert*, 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). The first prong involves a determination of whether the alleged acts or omissions are discretionary in nature, *i.e.*, those involving judgment or choice. *Williams*, 50 F.3d at 309 (citing *Gaubert*, 499 U.S. at 324, 111 S.Ct. 1267). This determination hinges upon whether the government conduct is governed by any mandatory statute, regulation or policy. If such a mandatory rule applies, then the conduct involves no element of discretion and the claim is not barred by the discretionary function exception. *Berkovitz*, 486 U.S. at 546, 108 S.Ct. 1954. If no such mandatory statute, regulation or policy applies, then the second prong of the *Berkovitz–Gaubert* test must be examined.

■ The second prong requires that the discretion be "based on considerations of public policy." *Berkovitz*, 486 U.S. at 531, 108 S.Ct. 1954; *Gaubert*, 499 U.S. at

316, 111 S.Ct. 1267. If the discretionary actions are determined to be in furtherance of public policy or a regulatory scheme then the exception applies. *Id.* In resolving this inquiry, the focus is on whether the government's discretion is "of the nature and quality that Congress intended to shield from liability." *Williams,* 50 F.3d at 309 (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 807–08, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984)). In *United States v. Baum,* the Fourth Circuit noted that this is not a fact-based inquiry; rather, the court is "to look to the nature of the challenged decision in an objective, or general sense, and ask whether that decision is one which we would expect inherently to be grounded in considerations of policy." 986 F.2d 716, 721 (4th Cir.1993). The Fourth Circuit further stated that the absence of a deliberative process is not relevant to an inquiry under the discretionary function exception. *Id.* ("[W]e find it largely irrelevant the presence or absence of evidence that involved government agents which did or did not engage in a deliberative process before exercising their judgment."). Thus, the focus of the inquiry is on "the nature of the actions taken and on whether they are susceptible to policy analysis." *Gaubert,* 499 U.S. at 325, 111 S.Ct. 1267.

McKeel strives to find a specific directive governing the Army's response when it encountered the deteriorating insulation in the ventilation ducts. McKeel suggests that specific safety policies and procedures mandated that if there was an unknown substance found in the duct work or building, "the substance should be sampled; the area cordoned; and the individuals warned to keep out of the area until the substance is identified." *Pl.'s Opp.* at 4. McKeel argues that the Army had no option but to adhere to the above directives when it encountered the deteriorating vent insulation in Building E–3100. The government contends, to the contrary, that it had complete discretion in the manner in which to respond to the deteriorating insulation, namely hiring a contractor to replace, retrofit and rebalance the air system. The government is correct.

McKeel has failed to show the existence of any mandatory statutes, regulations or policies constraining the Army's response to the problem of "falling dust." In fact, the deposition testimony of government officials submitted by McKeel supports the government. One deposition clearly states that there was no standard operating procedure regarding the testing of substances suspected of being hazardous.[5] Similarly,

---

5. Relevant deposition excerpts are as follows:

Q. Is there a standard procedure for when a substance that may be suspected as being hazardous is found on the base? Is there a set procedure that is followed then?

A. Found where?

Q. For instance, we'll say—

A. Depends where it is found.

Q. Lets say in E–3100, there is a suspicious dust found in the ductwork and Vicki was told about it .... Is there a procedure then that would follow to make a determination on what the material was?

A. That is pretty much what we did.

Q. Let me put it this way.

A. There is not an SOP ["Standard Operating Procedure"], if that's what you mean.

*Barber Dep.* at 52–53;

\* \* \* \* \* \*

Q. Let me go back so the record is clear .... In that situation, where Vicki found this dust, was there a procedure that either was followed, if you know, or a procedure that wasn't followed....

A. I don't know.

*Barber Dep.* at 52–54;

\* \* \* \* \* \*

Q. Do you know if there is a procedure for all of the tenants on the base that they follow a certain procedure, again, en-

a second deposition supports the government's position that it had discretion to respond to the deteriorating insulation in the manner it chose.[6] The testimony of Benjamin Casole, III, the Chief of Safety and Chemical Operations Branch at the U.S. Army Medical Research Institute of Chemical Defense, is likewise unavailing. Although Casole testified that regulations govern the testing of unknown substances, Casole qualified his testimony, stating that such regulations are only pertinent to substances suspected of being hazardous. *Casole's Dep.* at 20. Here, McKeel has failed to establish that the government believed or had reason to believe that the deteriorating insulation contained any hazardous substances.[7] In fact, there was testimony

to the contrary—that there was no reason to believe that the deteriorating ducts would contain hazardous substances. *Boisseau Dep.* at 19–21. Therefore, even if there were regulations or procedures governing the testing of suspected hazards, McKeel has failed to establish their application in the instant case. Consequently, I cannot conclude that the government was compelled to follow any specified directives with respect to the discovery of deteriorating insulation within the vents.

Moreover, as discussed *supra,* the state nondelegable duty doctrine does not apply under the FTCA; therefore, when the government contracted away its duty to ensure the safety of the contractor's employees, the government retained full dis-

---

countering something potentially hazardous?

A. I don't know that there is an actual written procedure, no.

Q. Do you know of an unofficial procedure that you have seen followed?

A. I think that pretty much what you outlined is what most safety professionals would do.

Q. Just so the record is clear, taking the sample, cordoning off the area, and warning people that there might be a potential hazard and try and keep people out of it?

A. Yeah, and how you take the sample depends upon what you think the hazard is.

*Barber Dep.* at ¶¶ 55–56.

6. Other relevant testimony is as follows:

Q. Are you aware of any standard procedure that you or members of your group are to utilize when you discover a sort of suspicious material?

A. Well, it would depend. Can you—on circumstances and where it was found. It is hard to give an overall pat answer to that.

Q. Okay. This will sound very familiar.

A. Okay.

Q. Suppose a substance that no one knows what it is found in the duct work in building E–3100 during a contractor's working on the duct work. What would be the procedure that your group would

recommend or that you would recommend?

A. Well, I guess it would depend on how it was brought to us. I would probably look at it myself. We would probably have Industrial Hygiene take a sample and then send it off for analysis. But being if it's in supply duct work it would be nothing I would be concerned about because there shouldn't be anything in supply duct work.

Q. Would you cordon off the area at all until you got the results back?

A. No.

*Boisseau Dep.* at ¶¶ 19–21.

7. McKeel appears to argue that the government should have known that the deteriorating felt insulation contained hazardous PCBs because the air handlers used in the vent system were located on the roof and PCBs had been used in the roofing material. McKeel posits that the government should have assumed that the PCBs in the roofing material could have been drawn in through the air handlers where they eventually settled within the insulation. McKeel, however, has failed to allege any policies, regulations or statutes that governed the government's assessment of risks. Therefore, I am unshaken in my conclusion that the government had complete discretion when assessing whether the deteriorating insulation posed a health risk.

cretion to decide the manner in which to formulate a response to a potential hazard or even whether to formulate a response at all.

Finding that no mandatory regulation or policy governed the handling of the deteriorating insulation, I turn now to the second prong of the *Berkovitz—Gaubert* analysis—whether the government's response to the deteriorating insulation in the air ventilation system is the type of decision that normally involves considerations of policy. Specifically, the proper inquiry is whether the government's response to the deteriorating insulation is susceptible to policy analysis. Here, the government responded to the deteriorating insulation by hiring a contractor to retrofit and to rebalance the air system, i.e., deciding to engage an independent contractor to remove the parts of the air ventilation system which contained the deteriorating insulation.

Case law clearly establishes that "[t]he decision to hire an independent contractor to render services for the United States is precisely the type of decision that the exception is designed to shield from liability because it involves exercising judgment based on considerations of policy . . . ." *Williams,* 50 F.3d at 310 (citing *Myers & Myers, Inc. v. Unites States Postal Serv.,* 527 F.2d 1252, 1256 (2d Cir.1975); *Scanwell Lab., Inc. v. Thomas,* 521 F.2d 941, 948 (D.C.Cir.1975), *cert. denied,* 425 U.S. 910, 96 S.Ct. 1507, 47 L.Ed.2d 761 (1976); *Gowdy v. United States,* 412 F.2d 525, 529 (6th Cir.), *cert. denied,* 396 U.S. 960, 90 S.Ct. 437, 24 L.Ed.2d 425 (1969); *Thompson v. Dilger,* 696 F.Supp. 1071, 1077 n. 9 (E.D.Va.1988)). In *Williams,* the Fourth Circuit reasoned that before deciding to engage a contractor the government has to weigh considerations such as expenses, payment, access to the premises, administration, and a "veritable plethora of fac-

tors." 50 F.3d at 310. Similarly, in the instant case, the government's decision to hire an independent contractor to remedy the problem of the deteriorating insulation falls within the discretionary function exception.

Moreover, inherent in the government's decision to engage an independent contractor is the government's discretionary judgment that the insulation need not be tested for hazardous substances. Therefore, no genuine question remains as to whether the government's election not to test the insulation is of the type that normally involves considerations of policy.

Case law is replete with examples where governmental decisions concerning the proper response to hazards are protected from tort liability by the discretionary function exception. *See, e.g., Lockett v. United States,* 938 F.2d 630, 639 (6th Cir. 1991) (proper response to the discovery of PCBs in a residential area, including not making any response at all, is within the discretionary function exception to the FTCA); *Myslakowski v. United States,* 806 F.2d 94, 97 (6th Cir.1986), *cert. denied,* 480 U.S. 948, 107 S.Ct. 1608, 94 L.Ed.2d 793 (1987) (decision whether to warn public that government jeeps for sale to the public might be susceptible to rollover is a discretionary function); *Childers v. United States,* 40 F.3d 973, 976 (9th Cir.1994), *cert. denied,* 514 U.S. 1095, 115 S.Ct. 1821, 131 L.Ed.2d 744 (1995) (decisions concerning the manner and types of warnings to be placed on hiking trails is a discretionary function barring suit); *Kiehn v. United States,* 984 F.2d 1100, 1106 (10th Cir.1993) (decision whether to warn of dangers of rock climbing a discretionary function); *Layton v. United States,* 984 F.2d 1496, 1502–03 (8th Cir.), *cert. denied,* 510 U.S. 877, 114 S.Ct. 213, 126 L.Ed.2d 170 (1993) (failure to warn tree-cutting contractor re-

garding hazards in cutting trees protected by discretionary function exception).

The Fourth Circuit has similarly held that judgments regarding the proper response to hazards fall within the protection of the discretionary function exception. *See, e.g., Bowman v. United States,* 820 F.2d 1393, 1395 (4th Cir.1987); *Baum v. United States,* 986 F.2d 716 (4th Cir.1993). In *Bowman,* the Court held that the government's alleged negligence in failing to place a guardrail along the embankment of the Blue Ridge Parkway fell within the discretionary function exception to the FTCA. In so ruling, the Fourth Circuit reasoned

> [w]hether that decision grew out of a lack of financial resources, a desire to preserve the natural beauty of the vista, a judgment that the hazard was insufficient to warrant a guardrail, or a combination of all three is not known. What is obvious is that the decision was the result of a policy judgment. One can argue that another policy, which places greater emphasis upon safety, is more desirable. However, by the discretionary function exception, Congress intended to prevent courts from second guessing federal policy.

*Id.* at 1395.

The Fourth Circuit reiterated its interpretation of the discretionary function exception in *Baum.* In *Baum,* the plaintiffs were occupants of a vehicle that penetrated the guardrail on a National Park Service bridge and plummeted twenty-two feet to a parkway below the bridge. In his complaint, Baum charged that the National Park Service was negligent in designing, constructing and maintaining the guardrail system in place at the time of the accident. Baum specifically alleged that the National Park Service was negligent in using cast iron in constructing the posts holding the steel bridge rail and in failing to replace the cast iron guardrail posts to meet current engineering requirements. The Fourth Circuit explained that the choice of materials to be used in the parkway's guardrail and the decision of how and when to replace a guardrail are discretionary choices involving planning level decisions which are bound up in policy considerations. *Baum,* 986 F.2d at 722–24.

Against this backdrop, it is clear that the governmental actions alleged by plaintiff in the instant case fall squarely within the protections of the discretionary function exception as defined by the Fourth Circuit. The government's assessment of the unknown substance and its response based upon that assessment are inextricably tied to a variety of public policy considerations—including balancing fiscal resources. Thus, on the facts of this case, this court lacks subject matter jurisdiction over any remaining claims of negligence.

*Misrepresentation Exception*

The Unites States is insulated from liability "arising out of ... misrepresentation [or] deceit ...." 28 U.S.C. § 2680(h). Section 2680(h) applies to claims arising out of negligent, as well as intentional, misrepresentation. *United States v. Neustadt,* 366 U.S. 696, 705–706, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961). Hence, there is no doubt that McKeel's misrepresentation claims are barred. Plaintiff appears to concede this point, as he has failed to respond to the government's argument on this point.

(iv)

For the reasons set forth herein, I shall grant the government's motion to dismiss for lack of subject matter jurisdiction. An Order follows.

ORDER

In accordance with the foregoing Memorandum, it is this 19th day of December,

2001, by the United States District Court for the District of Maryland, ORDERED

(1) The defendant's motion to dismiss is GRANTED; and it is further ORDERED

(2) This case is DISMISSED WITH PREJUDICE; and it is further ORDERED

(3) The Clerk shall CLOSE THIS CASE and TRANSMIT copies of this Order and foregoing Memorandum to all counsel.